## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

EARLVILLE COMMUNITY FIRE PROTECTION DISTRICT, individually and on behalf of a class of all others similarly situated,

        Plaintiff,

  v.

3M COMPANY (F/K/A MINNESOTA MINING AND MANUFACTURING COMPANY), EIDP, INC., DUPONT DE NEMOURS, INC., THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, CORTEVA, INC., ELEVATE TEXTILES, INC., FIRE-DEX, LLC, GLOBE MANUFACTURING COMPANY, LLC, HONEYWELL SAFETY PRODUCTS USA, INC., INNOTEX, LION GROUP, INC., MILLIKEN & COMPANY, SAFETY COMPONENTS FABRIC TECHNOLOGIES, INC., STEDFAST USA, INC., and W.L. GORE & ASSOCIATES, INC.,

        Defendants.

Case No: 26-cv-2388

**CLASS-ACTION COMPLAINT**

**(Demand for Jury Trial)**

## <u>CLASS-ACTION COMPLAINT</u>

Pursuant to Federal Rule of Civil Procedure 23, Earlville Community Fire Protection District ("Earlville"), individually and on behalf of all others similarly situated, brings this Class-Action Complaint for damages and for equitable and injunctive relief against Defendants EIDP, Inc., DuPont de Nemours, Inc., The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M"), Elevate Textiles, Inc. ("Elevate Textiles"), Fire-Dex, LLC ("Fire-Dex"), Globe Manufacturing

Company, LLC ("Globe"), W.L. Gore & Associates, Inc. ("Gore"), Honeywell Safety Products USA, Inc. ("Honeywell"), Innotex, Lion Group, Inc. ("Lion"), Milliken & Company ("Milliken"), Safety Components Fabric Technologies, Inc. ("Safety Components"), and StedFast USA, Inc. ("Stedfast") (collectively, the "Defendants"), alleging the following based upon knowledge as to its own actions, the facts and circumstances, the reasonable investigation of counsel, information and belief, and a review of publicly available information.

## I. INTRODUCTION

1.      Firefighters are critically important to the health, safety, and welfare of our communities. They risk their own lives to serve and protect the public, and the public depends upon their services as first responders. Many risks inherent in firefighting cannot be mitigated. However, the intentional addition of hazardous levels of cancer-causing perfluorinated and polyfluorinated alkyl substances ("PFAS") into their structural firefighting personal protective equipment ("PPE") is one risk to which firefighters never should have been subjected.

2.      Yet for decades, Defendants have designed, manufactured, marketed, commercialized, and sold firefighter PPE, including hoods, helmets, coats, pants, gloves, boots, reflective tape, and other multilayered PPE ("Turnout Gear") that is laden with highly toxic, carcinogenic, synthetic perfluorinated and polyfluorinated alkyl substances ("PFAS"). They did so using a closely knit, highly interdependent, multi-component Turnout Gear supply chain (the "PFAS Turnout Gear supply chain"), through which each Defendant provided PFAS products and related services that were essential to the final PFAS-contaminated Turnout Gear ensembles ("PFAS Turnout Gear") that were purchased by Earlville and other similarly situated entities ("Class Members").

3.      PFAS are synthetic chemical compounds made of nearly indestructible chains of carbon and fluorine atoms. They are persistent, highly toxic chemicals, immunotoxic agents, and carcinogenic compounds that bioaccumulate, biomagnify, migrate, and are known to pose a serious risk of injury to the health and safety of humans, especially to firefighters because of their occupational susceptibility.[1] Once PFAS are released into the environment and the human body, PFAS persist for long—if not indefinite—periods of time, earning them the nickname "forever chemicals."

4.      PFAS concentrations and migration substantially increase when exposed to physical stressors associated with firefighting activities. PFAS in the PFAS Turnout Gear leach, shed, crumble, abrade, off-gas (a process in which a chemical is emitted in the form of a gas), and otherwise migrate out of the PFAS Turnout Gear, contaminating the surrounding environment, property, and persons with highly toxic, carcinogenic, and unreasonably dangerous PFAS.

5.      Defendants knew that the PFAS in the PFAS Turnout Gear would not remain contained or stable and that their PFAS Turnout Gear would cause unreasonably dangerous exposure and contamination of Earlville's and Class Members' firefighters, fire stations, fire trucks, occupational equipment, personal property, firehouse furnishings, lockers and storage areas, laundering equipment and facilities, bunk rooms, other surrounding property, and other exposed employees and persons.[2]

---

[1] *See, e.g.*, Nat'l Toxicology Program, U.S. Dep't of Health & Hum. Servs., NTP Monograph on Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate (Sept. 2016), *available at* https://ntp.niehs.nih.gov/sites/default/files/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf (last visited Apr. 14, 2026); Nur-Us-Shafa Mazumder et al., *Firefighters' Exposure to Per-and Polyfluoroalkyl Substances (PFAS) as an Occupational Hazard: A Review*, FRONTIERS IN MATERIALS (Mar. 2023), *available at* https://pubmed.ncbi.nlm.nih.gov/38074949/.

[2] *See, e.g.*, Anna S. Young et al., *Per- and Polyfluoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust*, J. EXPO. SCI. & ENVIRON. EPIDEMIOLOGY (Feb. 2021), https://www.nature.com/articles/s41370-021-00288-7.

CLASS-ACTION COMPLAINT AND DEMAND FOR JURY TRIAL                    Page **3** of **123**

6. Nevertheless, Defendants agreed to use large quantities of added PFAS throughout their PFAS Turnout Gear, in every component and layer, from infused fibers and treated fabrics to finishing sprays and glues, as their preferred technology for achieving desired water and heat resistance. They did so despite knowing that the chemical characteristics, persistence, bioaccumulation, toxicity, and carcinogenicity of PFAS render them particularly unsuitable for use in firefighting activities.

7. Defendants further agreed to operate their PFAS Turnout Gear supply chain using a coordinated scheme to conceal, sanitize, destroy, falsify, misrepresent, and suppress critical PFAS toxicity data, including cancer-signal studies, immune-system suppression data, bioaccumulation evidence, and worker blood-level results, to create a false safety narrative for PFAS and conceal from state and federal regulators, Earlville, Class Members, and the general public the truth about PFAS-related dangers and risks (the "PFAS Concealment Scheme").

8. Defendants agreed to and have carried out the PFAS Concealment Scheme for the shared purposes of delaying and avoiding state and federal disclosure requirements, testing obligations, and regulation of PFAS; continuing their profitable sales of PFAS molecules, chemicals, Turnout Gear components, and other related products, which they knew would have been banned or highly regulated if PFAS toxicity, risks, and harms were discovered; avoiding liability for introducing PFAS into the U.S. stream of commerce and causing property damage, environmental damage, and devastating toxic exposure; increasing profits by using PFAS in Turnout Gear and avoiding the costs and competition of innovation, development, and production of safer PFAS-free Turnout Gear; and otherwise dominating the Turnout Gear marketplace and obtaining billions of dollars in ill-gotten revenues from selling Earlville and Class Members PFAS

Turnout Gear that Defendants knew was unsafe, unsuitable for use, and would cause widespread property contamination and unreasonably dangerous toxic exposure.

9. Defendants carried out their PFAS Concealment Scheme, in part, by using mail and wire to: (1) disseminate blatantly false, misleading, untrue, and deceptive representations about the nature, extent, scope, and necessity of using PFAS in Turnout Gear; (2) manipulate, conceal, and bury adverse data, research, studies, and information about relevant PFAS chemical characteristics, toxicity, carcinogenicity, migration, known adverse human-health risks, and unreasonably dangerous environmental risks; (3) evade and avoid providing relevant data and information required for compliance with government investigations, regulations, and mandated government disclosures; (4) unduly influence standards and certification protocols established by trade organizations and regulatory bodies, such as the National Fire Protection Association ("NFPA"); and (5) interfere with and prevent research, innovation, and development that would have resulted in the introduction of PFAS-free alternatives in the Turnout Gear marketplace.

10. Earlville and Class Members bought, paid for, provided, and continue to use Defendants' PFAS Turnout Gear to protect their firefighters from the extreme conditions of firefighting activities,[3] only to discover that Defendants' Turnout Gear is laden with highly toxic, cancer-causing PFAS that migrate out of the Turnout Gear, thereby contaminating the surrounding environment, property, and persons.

---

[3] Andrew Maizel et al., *Per- and Polyfluoroalkyl Substances in New Firefighter Turnout Gear Textiles*, NIST Technical Note (May 2023), https://www.nist.gov/publications/and-polyfluoroalkyl-substances-new-firefighter-turnout-gear-textiles ("Maizel, *PFAS in New Firefighter Turnout Gear Textiles*").

11.     Approximately 70 percent of firefighters are predicted to eventually die from cancer, which is significantly higher than the general population.[4] Firefighter occupational cancer has become the "leading cause of line-of-duty death in the fire service."[5] That change directly corresponds to the timing of Defendants' addition of PFAS to PPE and their commercialization of PFAS Turnout Gear.

12.     The truth about PFAS—and the disturbing extent to which Defendants have covered up that truth—is now being uncovered through scientific studies, litigation, government enforcement actions, whistleblowers, and other sources. The collective public outrage over PFAS contamination and toxic exposure has resulted in over 15,000 personal injury claims and, in 2025 alone, nearly 350 PFAS-related bills were introduced across 39 states.[6]

13.     The breadth of judicial and legislative activity is unprecedented for a single class of chemicals and is being driven, in part, by the discovery of the extent to which Defendants placed "profits over people" and buried the gravity of the adverse health impacts of PFAS. As expressed by Illinois Representative Mike Kelly, who co-sponsored the newly enacted Illinois state law banning PFAS in Turnout Gear: "Little did we know that the actual gear designed to protect us is actually killing us."

14.     Facing mounting peer-reviewed scientific research, increased public awareness, demands for transparency and disclosure, and growing state law and municipal prohibitions on

---

[4] Graham F. Peaslee et al., *Another Pathway for Firefighter Exposure to Per- and Polyfluoroalkyl Substances: Firefighter Textiles*, ENVTL. SCI. & TECH. LETT. (June 2020), at 594–99, https://doi.org/10.1021/acs.estlett.0c00410 ("Peaslee study").

[5] Int'l Ass'n of Fire Fighters, *Fire Fighter Cancer Awareness Month*, https://www.iaff.org/cancer-awareness-month (last visited Apr. 11, 2026).

[6] Daniel Kampf, *Forever Chemicals Face Sweeping Bans as States Pass PFAS Laws in 2025*, Multistate, https://www.multistate.us/insider/2026/1/22/forever-chemicals-face-sweeping-bans-as-states-pass-pfas-laws-in-2025 (last visited Apr. 15, 2026).

CLASS-ACTION COMPLAINT AND DEMAND FOR JURY TRIAL                Page **6** of **123**

PFAS in Turnout Gear, Defendants have recently begun publicly acknowledging that PFAS—especially in the concentrations included in PFAS Turnout Gear—are unreasonably dangerous.

15.     As explained by Defendant Milliken, which manufactures textiles for firefighter Turnout Gear: "Milliken saw the writing on the wall and got to work."[7] The "writing on the wall" was "[t]he growing chorus of concern over the last several years from firefighters, lawmakers, insurers, and environmentalists," which "has all but guaranteed that use of PFAS was going away sooner rather than later."[8]

16.     When Milliken saw the "handwriting on the wall" that PFAS were being regulated and banned in Turnout Gear ensembles, it was able to develop PFAS-free alternatives in just 10 months. In February 2022, it announced its plan to eliminate PFAS as an ingredient in its textile portfolio by the end of the year. As of December 31, 2022, Milliken announced it had succeeded in removing PFAS-based finishes and fibers from its textile portfolio.[8]

17.     In December 2022, as Milliken was announcing its PFAS-free technologies, Defendant 3M announced that it would exit all PFAS manufacturing and work to discontinue its use of PFAS across its product portfolio by the end of 2025.[9]

---

[7] Milliken & Co., *Why Is PFAS Used in Firefighters' Protective Gear?*, https://www.milliken.com/en-us/businesses/textile/blogs/why-is-pfas-used-in-firefighters-protective-gear (last visited Apr. 13, 2026).

[8] Jesse Roman, *Deadline Pressure: Ahead of the Most Consequential Changes to Firefighter Personal Protective Equipment (PPE) in Decades, Dozens of Experts from an Array of Fields Met at NFPA to Discuss the Transition, the Many Unknowns, and What Fire Departments Need to Know*, NAT'L FIRE PROTECTION ASS'N J. (Apr. 16, 2025), https://www.nfpa.org/news-blogs-and-articles/nfpa-journal/2025/04/14/deadline-pressure.

[9] 3M, *3M's PFAS Stewardship*, https://www.3m.com/3M/en_US/pfas-stewardship/uses-applications/?utm_medium=redirect&utm_source=vanity-url&utm_campaign=pfas.3m.com/pfas_uses (last visited Apr. 11, 2026).

18.     Despite years of false representations by Defendants that PFAS were not harmful, and that alternative, safer, non-PFAS technologies did not exist, they were able to quickly bring to market PFAS-free alternatives when they finally recognized the "handwriting on the wall."

19.     Milliken now admits that PFAS are not necessary components of Turnout Gear ensembles and even poses the question on its website: "So what will you lose when you make the shift to non-PFAS gear?" and then answers that question, "Just the PFAS."[10]

20.     Milliken represents that its non-PFAS technologies not only meet industry certification requirements, but even exceed "performance standards" and perform better than PFAS technologies, providing in part: "We've developed some non-PFAS technologies that repel moisture more effectively than PFAS can, and we've also created a soil-release chemistry that's better than the best existing technologies."[11]

21.     The problem is that until 2025, Defendants' misconduct resulted in PFAS being added to all Turnout Gear in the marketplace, including Turnout Gear purchased by Earlville and Class Members.

22.     The toxic PFAS contamination caused by the PFAS Turnout Gear is ongoing and escalating. Unless and until the PFAS Turnout Gear is disposed of properly, the contaminated property effectively remediated, and the equipment replaced, the unreasonably dangerous toxic exposure and contamination will continue—even escalating with PFAS Turnout Gear use,

---

[10] Milliken & Co., *How Non-PFAS Fabric Impacts the Performance of Turnout Gear*, https://www.milliken.com/en-us/textiles/blogs/how-non-pfas-fabric-impacts-the-performance-of-turnout-gear (last visited Apr. 22, 2026).

[11] Milliken & Co., *Milliken Becomes First Textile Manufacturer to Offer Non-PFAS Materials*, https://www.milliken.com/en-us/businesses/textile/news/milliken-becomes-first-textile-manufacturer-to-offer-non-pfas-materials (last visited Apr. 15, 2026).

laundering, and handling—causing ongoing injuries and damage to Earlville and Class Members'

firefighters, fire stations, property, and surrounding environment.

23.     Earlville is asserting public rights and the public interest in pursuing legal remedies

against Defendants to recover the costs of purchasing the PFAS Turnout Gear and the costs of

remediation, repair, and replacement of property contaminated by PFAS, including the costs of

removal, remediation, and replacement of the PFAS Turnout Gear.

## II.     PARTIES

### A.     Earlville

24.     Earlville is a municipal corporation organized under the Illinois Fire Protection

District Act, 70 ILCS 705. Earlville operates a fire department located in Earlville, Illinois.

Earlville's firefighters provide services in Earlville, Illinois and in an approximately 77-mile

surrounding area, protecting the lives and property of all persons, businesses, and public or private

entities therein.

25.     Earlville is financially responsible for purchasing and providing the equipment,

tools, and gear—including Turnout Gear—for its firefighters. Since at least 2001, Earlville has

purchased and continues to purchase and use Turnout Gear ensembles that are designed,

manufactured, assembled, certified, marketed, promoted, sold, distributed, and otherwise

commercialized by Defendants.

26.     As a public employer, Earlville is regulated by the Illinois Occupational Safety and

Health Act ("Illinois OSHA"), which mandates that employers provide employees with PPE that

is safe, non-hazardous, and adequate for the risks of the job.[12] Illinois OSHA incorporates federal

---

[12] Ill. Dep't of Labor, *Illinois Occupational Safety and Health Act*, 820 ILCS 219/1 *et seq.* (applying OSHA-equivalent safety requirements to public employers, including fire departments).

OSHA's general duty principles and PPE standards for public-sector workers, requiring employers to furnish equipment that is free from recognized hazards likely to cause death or serious physical harm.[13] The Illinois OSHA compliance guide for Illinois fire departments also adopts federal standards for PPE and firefighter safety.

27.     All Turnout Gear purchased from Defendants and used by Earlville contains and is thus contaminated by PFAS. The PFAS Turnout Gear purchased from Defendants subjects its firefighters and property to unreasonably dangerous and carcinogenic PFAS.

28.     Earlville has suffered injuries as a direct and proximate result of its purchase and use of Defendants' PFAS Turnout Gear, exposing its property and firefighters to toxic and carcinogenic PFAS from the PFAS Turnout Gear.

## B.     Defendants

29.     For decades, PFAS Turnout Gear has been designed, tested, manufactured, applied, marketed, distributed, and sold by and through the collective, organized, and highly interdependent contributions of Defendants, each of which contributes a necessary and essential component, material, chemical, or related service without which the PFAS Turnout Gear could not be produced and sold. Each Defendant knows and intends that its products and services will be combined to create the final PFAS Turnout Gear ensembles that are purchased by Earlville and Class Members for use by their firefighters.

---

[13] 29 U.S.C. § 654(a)(1) (General Duty Clause) (requiring employers to furnish employment and a workplace "free from recognized hazards"); 29 C.F.R. § 1910.132 (Occupational Safety and Health Standards, Personal Protective Equipment) (requiring PPE to protect employees from workplace hazards); *see also* Ill. Dep't of Labor, 820 ILCS 219/20 (adopting federal OSHA standards for public-sector workers).

30.     Each named Defendant is in some manner responsible for the intentional addition of PFAS to Turnout Gear, and the related acts alleged herein, and Defendants' misconduct directly and proximately caused injuries to Earlville and Class Members.

31.     Each Defendant derived substantial benefits and revenue from their participation in the manufacture and sale of PFAS Turnout Gear to Earlville and Class Members, as well as their common scheme to conceal, mislead, misrepresent, and otherwise deceive government regulators, Earlville, Class Members, and others about the chemical characteristics, toxicity, persistence, migration, risks to health, and other relevant data and information about PFAS, its safety, and its suitability for use in Turnout Gear.

32.     Defendants are jointly and severally liable for the injuries and harms caused to Earlville and Class Members by the PFAS Turnout Gear and Defendants' deceptions and other misconduct alleged herein.

33.     Defendants designed, created, developed, tested, manufactured, packaged, promoted, marketed, advertised, certified, promoted, distributed, and/or sold the PFAS Turnout Gear, components, equipment, materials, and/or chemicals throughout the United States, in and effecting interstate commerce, and caused harm to Earlville and Class Members.

34.     Defendants expected or should have expected their actions to have consequences throughout the United States, including in Minnesota.

35.     Defendants purposefully availed themselves of the privilege of conducting activities in the State of Minnesota, thus invoking the benefits and protections of its laws.

### 1.     PFAS Chemical Finishes Defendants

36.     Defendants DuPont and 3M (collectively, the "PFAS Chemical Finishes Defendants") design, manufacture, market, and sell PFAS molecules and PFAS performance

chemicals for high-hazard clothing, including durable water-and-oil repellants, fluorochemical finishes, surfactants, adhesives, fluoropolymer dispersions, membrane coatings, adhesion promoters, finishing sprays, repellency boosters, durable water repellant ("DWR") coatings, and other PFAS performance chemicals applied to the fabrics, textiles, adhesives, reflective tape, and assembled Turnout Gear (collectively, the "PFAS Chemical Finishes").

37.    The PFAS Chemical Finishes Defendants invented, developed, and commercialized PFAS Chemical Finishes into an essential component in the billion-dollar Turnout Gear industry.

38.    PFAS Turnout Gear purchased by Earlville and Class Members contains PFAS Chemical Finishes designed, manufactured, marketed, and sold by at least one, and often more than one, of the PFAS Chemical Finishes Defendants.

39.    During the relevant time, the Chemical Finishes Defendants collaborated in the creation, development, manufacture, and commercialization of PFAS molecules, general PFAS performance chemistries, and PFAS Chemical Finishes by sharing research, development, critical data, investigative results, performance measures, reports, and other pertinent information related to the performance, impact, and safety of PFAS.

40.    But for the PFAS Chemical Finishes Defendants' creation, development, manufacture, marketing, distribution, sale, and concealment efforts set forth herein, PFAS Turnout Gear would not have been manufactured and sold.

### a.    Defendant 3M

41.    3M, formerly known as Minnesota Mining and Manufacturing Company, is a Delaware corporation that does business throughout the United States. 3M has its principal place of business in St. Paul, Minnesota.

42.     3M's PFAS Chemical Finishes were among the earliest used in Turnout Gear and included perfluorooctane sulfonate ("PFOS"), PFOS-based surfactants and repellants, and Scotchgard™ fluorochemical repellents (legacy versions).

43.     In addition to PFAS Chemical Finishes, 3M invented, designed, manufactures, markets, sells, and has otherwise introduced into U.S. commerce and commercialized 3M Scotchlite™ Reflective Tape and other PFAS-containing components that are used in the PFAS Turnout Gear that was sold to and used by Earlville and its firefighters.

44.     3M was the dominant manufacturer and supplier of PFAS Chemical Finishes until 2002 and is still the world's largest PFAS tape and adhesive manufacturer.

45.     Defendant 3M is directly responsible for the addition of PFAS to the PFAS Turnout Gear that was sold to and used by Earlville and Class Members.

### b.     DuPont Defendants

46.     Defendant EIDP, Inc., formerly known as E.I. du Pont de Nemours and Company, is a Delaware corporation that does business throughout the United States. EIDP, Inc. has its principal place of business in Wilmington, Delaware.

47.     Defendant DuPont de Nemours, Inc., is a Delaware corporation that does business throughout the United States. DuPont de Nemours, Inc., has its principal place of business in Wilmington, Delaware.

48.     Defendant The Chemours Company ("Chemours") is a Delaware corporation that does business throughout the United States. Chemours has its principal place of business in Wilmington, Delaware. In 2015, EIDP, Inc. spun off its performance chemical business as a new, publicly traded company, Chemours. In connection with the transfer, Chemours assumed certain EIDP, Inc. assets and liabilities, including business lines and liabilities relating to the design,

manufacture, marketing, distribution, and/or sale of the PFAS Chemicals that are the subject of this Action.

49.     Defendant The Chemours Company FC, LLC, ("Chemours FC") is a Delaware corporation that does business throughout the United States. Chemours FC has its principal place of business in Wilmington, Delaware. Chemours FC operates as a subsidiary of Chemours and manufactures the PFAS Chemicals that are the subject of this Action.

50.     Defendant Corteva, Inc. ("Corteva") is a Delaware corporation that does business throughout the United States. Corteva has its principal place of business in Wilmington, Delaware. In 2019, DuPont de Nemours, Inc., spun off its agricultural business as a new, publicly traded company, Corteva, which currently holds EIDP, Inc. as a subsidiary. In connection with these transfers, Corteva assumed certain EIDP, Inc. assets and liabilities, including business lines and liabilities relating to the design, manufacture, marketing, distribution, and/or sale of the PFAS Chemicals that are the subject of this Action.

51.     The Complaint refers to EIDP, Inc., DuPont de Nemours, Inc., Chemours, Chemours FC, and Corteva, collectively, as the "DuPont Defendants" or "DuPont."

52.     DuPont has long been a leading PFAS manufacturer. In approximately 2002, PFOS were phased out and DuPont replaced 3M as the dominant supplier of fluorotelomer alcohols (FTOHs), C6 fluorotelomer acrylates, Zonyl™ fluorochemical repellents, and Capstone™ repellents—all of which are PFAS.

53.     DuPont is directly responsible for the addition of PFAS to the PFAS Turnout Gear that was sold to and used by Earlville and Class Members.

### 2.     PFAS Textile Defendants

54.     Defendants Gore, Elevate Textiles, Milliken, Safety Components, and Stedfast

(collectively, the "PFAS Textile Defendants") purchase PFAS Chemical Finishes from the PFAS Chemical Finishes Defendants for application and use in Turnout Gear fibers, fabrics, moisture barriers, and other textiles ("PFAS Textiles"). PFAS Textile Defendants also purchase PFAS molecules and chemicals from the PFAS Chemical Finish Defendants for use in their own proprietary PFAS Chemical Finishes used in their PFAS Textiles.

55.    PFAS Textile Defendants create, design, patent, manufacture, brand, certify, market, promote, distribute, sell, introduce into U.S. commerce, and otherwise commercialize PFAS Textiles, which are used by the Turnout Gear Assembler Defendants as components of the finished multi-component PFAS Turnout Gear ensembles that are sold to and used by Earlville and Class Members.

56.    All PFAS Turnout Gear purchased by Earlville and Class Members contain PFAS Textiles from one, and often more than one, of the PFAS Textile Defendants.

### a.    Defendant Gore

57.    Defendant Gore is a Delaware corporation that does business throughout the United States, including in Minnesota. Gore has its principal place of business in Newark, Delaware.

58.    Gore creates, designs, patents, manufactures, brands, certifies, markets, promotes, distributes, sells, introduces into U.S. commerce, and otherwise commercializes moisture barriers for use in PFAS Turnout Gear ensembles. Moisture-barrier materials available from Gore contain ePTFE Film, a polymer used in many industrial and medical applications, which falls under the PFAS definition.[14]

59.    Gore's moisture barriers are mandatory, performance-defining components

---

[14] Hayley Tincu, *What's the Latest in Turnout Gear Materials Technology?*, LION (June 15, 2024), *available at* https://www.lionprotects.com/blog/turnout-gear-materials-technology.

integrated into all finished Turnout Gear ensembles. Its moisture barriers are certified as a standalone component—"component recognized"—under NFPA standards, which allows the Turnout Gear Assembler Defendants to pursue certification of the full Turnout Gear ensemble using Gore's moisture barriers.

60.     Gore submits its moisture-barrier laminates for testing to third-party certification bodies (*e.g.*, Underwriter's Laboratories ("UL") or Safety Equipment Institute ("SEI")) to verify that the barrier meets NFPA performance requirements. It has numerous components with component-recognition for use in UL/SEI certified firefighter Turnout Gear ensembles.

61.     Gore's moisture barriers contain added PFAS and are laminated to specific substrates. This effectively results in its control over other components and PFAS Textiles specifications, including the scope and extent of PFAS and which combinations of PFAS Textiles can be used with their components, to achieve NFPA-compliance certification and commercialize PFAS Turnout Gear to Earlville and Class Members.

62.     Gore is the largest dominant supplier of polytetrafluoroethylene ("PTFE")-based seam tapes, fluoropolymer-based adhesive films, laminated composites, and PTE moisture-barrier laminates (Crosstech, Gore-Tex).

63.     Earlville and Class Members purchased and use PFAS-containing Turnout Gear made with Gore's PFAS-containing moisture barrier and other components. Gore is directly responsible for the addition of PFAS to the PFAS Turnout Gear that was sold to and used by Earlville and Class Members.

### b.     .Defendant Stedfast

64.     Defendant Stedfast is a Tennessee corporation that does business throughout the United States, including in Minnesota. Stedfast's corporate headquarters is in Piney Flats,

Tennessee.

65.    Stedfast creates, designs, patents, manufactures, brands, certifies, markets, promotes, distributes, sells, introduces into U.S. commerce, and otherwise commercializes moisture barriers for use in PFAS Turnout Gear ensembles. Moisture-barrier materials available from Stedfast contain ePTFE Film.

66.    Stedfast is one of the dominant moisture-barrier manufacturers in the United States, manufacturing and distributing Turnout Gear components such as Stedair® moisture barriers, which have component-recognition to be used in UL/SEI-certified Turnout Gear ensembles.

67.    Like Gore, Stedfast intentionally adds PFAS to its moisture barriers and other critically important components of Turnout Gear and exerts direction and control over which PFAS Textiles can be used in combination with its products, as well as the nature and scope of additional PFAS used throughout the Turnout Gear ensemble to achieve NFPA-compliance certification and commercialize PFAS Turnout Gear to Earlville and Class Members.

68.    Earlville and Class Members purchased and use PFAS-containing Turnout Gear made with Stedfast's PFAS-containing moisture barrier and related components. Stedfast is directly responsible for the addition of PFAS to the PFAS Turnout Gear that was sold to and used by Earlville and Class Members.

### c.    Defendants Elevate and Safety Components

69.    Defendant Safety Components is a Delaware corporation that does business throughout the United States, including in Minnesota. Safety Components has its principal place of business in Greenville, South Carolina. Safety Components is a subsidiary of Defendant Elevate Textiles.

70.    Defendant Elevate Textiles is a Delaware corporation that does business throughout

the United States. Elevate Textiles has its principal place of business in Charlotte, North Carolina. Elevate Textiles is the corporate parent of Safety Components.

71.    Defendant Elevate and Safety Components are directly responsible for the addition of PFAS to the PFAS Turnout Gear that was sold to and used by Earlville and Class Members.

### d.    Defendant Milliken

72.    Defendant Milliken is a privately held Delaware corporation that does business throughout the United States, including in Minnesota. Milliken has its principal place of business in Spartanburg, South Carolina

73.    Defendant Milliken is directly responsible for the addition of PFAS to the PFAS Turnout Gear that was sold to and used by Earlville and Class Members.

### 3.    Turnout Gear Assembler Defendants

74.    Defendants Globe, Lion, Innotex, Honeywell, and Fire-Dex (collectively, the "Turnout Gear Assembler Defendants") design, market, assemble, certify, brand, market, distribute and sell the final, finished PFAS Turnout Gear ensembles that are sold to and used by Earlville and Class Members.

75.    Earlville and Class Members purchased and use PFAS Turnout Gear assembled by, branded, labeled, certified, marketed, distributed, sold, and otherwise introduced into interstate commerce by one or more of the Turnout Gear Assembler Defendants.

76.    The PFAS Turnout Gear Assembler Defendants (1) source from other Defendants and component manufacturers in the Turnout Gear supply chain all of the materials necessary to assemble the PFAS Turnout Gear (*e.g.*, outer shells, moisture barriers, thermal liners, PFAS Chemical Finishes); (2) cut, sew (using PFAS-containing lubricants on their sewing equipment), laminate, prepare, and assemble the various components; (3) apply additional treatments or

finishes, including PFAS Chemical Finishes; (4) brand (under their own names) and label the PFAS Turnout Gear ensembles; (5) submit necessary applications and documentation for, and undergo testing of, the assembled PFAS Turnout Gear ensembles to obtain necessary certifications, such as UL/SEI NFPA-compliance certifications; and (6) advertise, market, distribute, sell, and otherwise introduce the PFAS Turnout Gear ensembles into interstate commerce, including to Earlville and the Class.

77.    Although the outer shell, moisture barrier, thermal liners, and other components contain PFAS, the PFAS Turnout Gear Assembler Defendants apply additional PFAS Chemical Finishes to the Turnout Gear, including to the outer shell and reinforcements.

78.    The PFAS Turnout Gear Assembler Defendants also add concentrated applications of PFAS Chemical Finishes, adhesives, and seam tapes to seal moisture-barrier seams, reinforce stress points, and add bond reflective trim, bonding patches, labels, and structural reinforcements.

79.    The PFAS Turnout Gear Assembler Defendants also apply PFAS-based repellency boosters and PFAS-based anti-static or anti-soiling sprays to the assembled PFAS Turnout Gear.

80.    PFAS Chemical Finishes, PFAS Textiles, PFAS adhesives, and other components of the PFAS Turnout Gear are utilized together in an integrated design pursuant to which Defendants add at each stage alarmingly high levels of PFAS, including fluorinated acrylic polymers, fluorotelomer-based surfactants, PFAS-modified urethanes, and PTFE-filled adhesive films.

81.    Each Turnout Gear Assembler Defendant knowingly and intentionally sourced, procured, and utilized PFAS Chemicals, PFAS Chemical Finishes, PFAS Textiles, PFAS adhesives, and other PFAS-laden component parts in the design, manufacture, and assembly of the PFAS Turnout Gear sold to and used by Earlville and Class Members throughout the United States.

82.     Each Turnout Gear Assembler Defendant collaborated with other members of the Turnout Gear supply chain and agreed to engage in the coordinated actions necessary to create and commercialize Turnout Gear that relied upon the addition of large quantities of PFAS, including PFAS Chemical Finishes, PFAS Textiles, PFAS Finishing Sprays, and other PFAS-containing components, to pass performance and other testing, obtain necessary certifications, and maintain market dominance of their products. They did so knowingly and with the intention that their finished Turnout Gear would be purchased by Earlville and Class Members for use in firefighting throughout the United States.

83.     The PFAS Turnout Gear Assembler Defendants have historically not reported (*i.e.*, to certifiers or in Material Safety Data Sheets ("MSDSs")) the inclusion of PFAS in the finished PFAS Turnout Gear Ensembles, either as a whole or as contained in a particular layer or component. To the extent they have made partial disclosures of PFAS-containing components, the PFAS Turnout Gear Assembler Defendants have not disclosed the existence, nature, or extent of PFAS contained in the glues, bonding agents, lamination adhesives, and other PFAS Chemical Finishes used during assembly and finishing of the PFAS Turnout Gear that was sold to Earlville and Class Members.

84.     The Turnout Gear Assembler Defendants are directly responsible for the addition of PFAS to the PFAS Turnout Gear that was sold and used by Earlville and Class Members.

### a.    Defendant Globe

85.     Defendant Globe is a New Hampshire corporation that does business throughout the United States, including in Minnesota. Globe has its principal place of business in Pittsfield, New Hampshire.

86.     Globe is the largest supplier of certified NFPA-compliant Turnout Gear ensembles

in the world,[15] and has been influential in the designing, manufacturing, and selling of firefighter Turnout Gear ensembles for over 130 years.[16]

87.    In 1918, Globe patented the three-layer turnout gear that is currently still in use by all manufacturers today.[17]

88.    In 1953, Globe was the first to use 3M™ SCOTCHLITE™ in its Turnout Gear.

89.    In 1966, Globe introduced DuPont NOMEX®.

90.    In about 1969, Robert Gore, an employee of his father's company, Defendant Gore, invented an expanded form of PTFE ("ePTFE"). Shortly thereafter, Gore commercialized ePTFE.

91.    In 1975 Globe participated in creating the first NFPA 1971 Standard for Protective Clothing for Structural Fire Fighting.

92.    Globe has continued to manufacture, market, and sell Turnout Gear that contains PFAS, using PFAS-containing materials supplied by Defendants and PFAS manufactured by Defendants 3M and/or DuPont.

93.    Globe is directly responsible for the addition of PFAS to the PFAS Turnout Gear that was sold to and used by Earlville and Class Members.

**b.    Defendant Lion**

94.    Defendant Lion is an Ohio corporation that does business throughout the United States. Lion has its principal place of business in Dayton, Ohio. Lion manufactures PPE with the PFAS Chemicals that are the subject of this Action.

95.    In approximately 1970, Lion began manufacturing, marketing, and selling PFAS

---

[15] MSA Safety Incorporated, *Globe (Firefighter Protective Clothing)*, https://us.msasafety.com/about-globe?locale=en (last visited Apr. 15, 2026).

[16] MSA Safety Incorporated, *Globe History*, https://us.msasafety.com/about-globe/history (last visited Apr. 15, 2026).

[17] *Id.*

Turnout Gear. Since that time, Lion has manufactured, marketed, and sold PFAS Turnout Gear, using PFAS-containing materials supplied by Defendants and PFAS manufactured by 3M and/or DuPont.

96.    Lion is directly responsible for the addition of PFAS to the PFAS Turnout Gear that was sold to and used by Earlville and Class Members.

### c.    Defendant Innotex

110.    Defendant Innotex is a Canadian company that does business throughout the United States, including in Minnesota. Innotex maintains its United States headquarters in Ohatchee, Alabama.

111.    Innotex manufactures, markets, and sells PFAS Turnout Gear, using PFAS-containing materials supplied by Defendants and PFAS manufactured by 3M and/or DuPont.

112.    Defendant Innotex is directly responsible for the addition of PFAS to the PFAS Turnout Gear that was sold to and used by Earlville and Class Members.

### d.    Defendant Honeywell

113.    Defendant Honeywell is a Delaware corporation that does business throughout the United States, including in Minnesota. Honeywell has its principal place of business in Charlotte, North Carolina.

114.    In 2008, Honeywell acquired Norcross Safety Products LLC and began manufacturing, marketing, and selling Turnout Gear containing PFAS. Since that time, Honeywell has continued to manufacture, market, and sell Turnout Gear containing PFAS, using PFAS-containing materials supplied by Defendants.

115.    Honeywell is directly responsible for the addition of PFAS to the PFAS Turnout Gear that was sold to and used by Earlville and Class Members.

### e.   Defendant Fire-Dex

116.   Defendant Fire-Dex is an Ohio Limited Liability Company that does business throughout the United States, including in Minnesota. Fire-Dex has its principal place of business in Medina, Ohio.

117.   In about 1983, Defendant Fire-Dex began manufacturing, marketing, and selling Turnout Gear that contains PFAS. Since that time, Fire-Dex has continued to manufacture, market, and sell Turnout Gear that contains PFAS, using PFAS-containing materials supplied by Defendants PFAS manufactured by Defendants 3M and/or DuPont.

118.   Fire-Dex is directly responsible for the addition of PFAS to the PFAS Turnout Gear that was sold to and used by Earlville and Class Members.

## III.   JURISDICTION AND VENUE

119.   This Court has subject-matter jurisdiction over this Action pursuant to 28 U.S.C. § 1332(d)(2)(A) because it is a class action in which the aggregate claims of all members of the proposed Class exceed $5,000,000.00, exclusive of interest and costs, and Earlville and most members of the proposed Class are citizens of a state different from each Defendant. This Court also has subject-matter jurisdiction under 28 U.S.C. § 1331, as this case asserts claims under 18 U.S.C. § 1964(a).

120.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because each Defendant transacts business in, is found in, and/or has agents in this District, and because many of the actions giving rise to this Complaint took place within this District.

121.   This Court has personal jurisdiction over Defendants because Defendants have maintained substantial contacts in the State of Minnesota and/or committed overt acts in furtherance of the conduct alleged herein throughout the State of Minnesota. The conduct was

directed at, or had the effect of, causing injury to persons residing in, located in, or doing business in the State of Minnesota.

122. Each named Defendant has proximately injured Earlville and Class Members, as alleged herein.

123. Defendants expected or should have expected their actions to have consequences in Minnesota. Defendants purposefully availed themselves of the privilege of conducting activities in Minnesota, thus invoking the benefits and protections Minnesota laws.

## IV.   FACTUAL ALLEGATIONS

### A.   PFAS and Their Effects on Human Health and the Environment

124. PFAS are a class of chemical compounds consisting of chains of carbon and fluorine that, due to the strength of the carbon-fluorine bonds, are highly resistant to being broken down in nature.[18]

125. In 1938, DuPont invented an early PFAS chemical that in the mid-1940s became known as "Teflon."[19]

126. In the 1940s, DuPont and 3M produced PFAS on a commercial scale. Since that time, the chemical stability, thermal stability, and water-repellent characteristics of PFAS have led to their use in a wide range of industrial and consumer products.

127. By 1948, DuPont was producing over 900 tons of PTFE per year.[20]

---

[18] *Nat'l Inst. Envtl. Health Sci., Per- and Polyfluoroalkyl Substances (PFAS),* https://www.niehs.nih.gov/health/topics/agents/pfc (last visited Apr. 15, 2026).

[19] *See* Science History Inst. Museum & Library, Beckman Center for the History of Chemistry: Interviews with Roy J. Plunkett, Apr. 17 & May 27, 1986, https://digital.sciencehistory.org/works/0g354g32t#tab=oh Downloads; Rudy Molinek*, The Long, Strange History of Teflon, the Indestructible Product Nothing Seems to Stick To*, SMITHSONIAN MAG. (Aug. 20, 2024), https://www.smithsonianmag.com/science-nature/the-long-strange-history-of-teflon-the-indestructible-product-nothing-seems-to-stick-to-180984920/.

[20] Bevin E. Blake & Suzanne E. Fenton, *Early Life Exposure to Per- and Polyfluoroalkyl Substances (PFAS) and Latent Health Outcomes: A Review Including the Placenta as a Target Tissue and Possible Driver of*

128.    By the 1950s, DuPont and 3M commercialized PFAS chemicals into very lucrative performance chemicals.

129.    Prior to DuPont's and 3M's invention and commercialization of PFAS, PFAS had not been found in the environment or human body.

130.    At all relevant times, DuPont and 3M collaborated in the creation, development, manufacture, and commercialization of PFAS molecules and performance chemistries. DuPont and 3M shared research, development updates, critical data, investigative results, performance measures, reports, and other highly pertinent information related to the performance, impact, and safety of PFAS.

131.    PFAS's qualities—including the strong, artificially-connected carbon-fluorine bond—cause them to persist in the environment for long, if not indefinite, time periods. Unlike many other environmental contaminants, PFAS chemicals are not metabolized by the body. Because PFAS resist breakdown and are slowly excreted by the body, PFAS accumulate over time in human tissue, including in the blood, liver, and kidneys.

132.    In recent decades, scientific researchers, environmentalists, and government agencies have raised concerns regarding the toxicity and persistence of PFAS. Such concerns have prompted a dramatic increase in epidemiological studies regarding the adverse effects of PFAS exposure on human health.

133.    Current, peer-reviewed scientific research has cautioned that PFAS exposure is hazardous to human health.[21] Studies have shown that exposure to PFAS is linked to a range of

---

*Peri- and Postnatal Effects*, TOXICOLOGY (Aug. 2020), https://www.sciencedirect.com/science/article/abs/pii/S0300483X20302043?via%3Dihub ("Blake, *Early Life Exposure to PFAS*").

[21] U.S. EPA, *Our Current Understanding of the Human Health & Environmental Risks of PFAS* (updated Feb. 10, 2026), https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas ("EPA, *Our Current Understanding*").

serious adverse health effects, including various cancers, tumors, liver damage, endocrine system disruption, immune system disorders, increased cholesterol levels, decreased fertility, high-blood pressure in pregnant women, developmental delays, and more.[22]

134.    PFAS exposure in humans can occur by dermal absorption, as well as by ingestion and inhalation.[23] In addition, PFAS spread through humans by crossing the placenta from mother to fetus and by passing to infants through breast milk.[24]

135.    Moreover, when exposed to heat, PFAS can off-gas, break down, and degrade into highly mobile and toxic particles and dust,[25] thereby increasing the risk of PFAS exposure by dermal absorption, ingestion, and inhalation.

136.    PFAS have been found to bioaccumulate and concentrate in human blood, bones, the liver, kidney, lungs, and other organs.[26] PFOA and PFOS impact the body's functions, including immune system, cardiovascular system, and the liver, leading to adverse health outcomes.

137.    Even everyday use of PFAS-products lead to the emission of dangerous fumes. Exposing PFAS to high temperatures—such as the PFAS in a non-stick frying pan—can cause,

---

[22] *Id.*

[23] Andrew S. Hall et al., *Skin Permeability of Perfluorocarboxylic Acids Using Flow-Through Diffusion on Porcine Skin*, TOXICS (Sept. 27, 2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC11511581/pdf/toxics-12-00703.pdf.

[24] Bevin E. Blake & Suzanne E. Fenton, *Early Life Exposure to Per- and Polyfluoroalkyl Substances (PFAS) and Latent Health Outcomes: A Review Including the Placenta as a Target Tissue and Possible Driver of Peri- and Postnatal Effects*, TOXICOLOGY (Aug. 2020) ("Blake, *Early Life Exposure to PFAS*").

[25] Anna S. Young et al., *Per- and Polyfluoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust*, J. EXPOSURE SCI. & ENVTL. EPIDEMIOLOGY 930–42 (2021), https://pubmed.ncbi.nlm.nih.gov/33542478/.

[26] Jose L. Domingo, *A Review of the Occurrence and Distribution of Per- and Polyfluoroalkyl Substances (PFAS) in Human Organs and Fetal Tissues*, ENVTL. RES. (May 2025), https://www.sciencedirect.com/science/article/pii/S0013935125004323.

CLASS-ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

among other things, the "Teflon Flu," the symptoms of which can include a tight chest, wheezing, difficulty breathing, and headaches.

138.    In September 2022, the EPA initiated a proposed rulemaking to designate PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").[27] In support, the EPA stated that "evidence indicates that these chemicals may present a substantial danger to public health or welfare or the environment[.]"

139.    The EPA has classified both PFOA and PFOS as likely human carcinogens.[28] The EPA has also concluded that there is no safe level of PFOA or PFOS exposure to humans.

140.    In April 2024, the EPA announced the final National Primary Drinking Water Regulation to establish legally enforceable levels, called Maximum Contaminant Levels (MCLs), for six PFAS in drinking water.[29] The EPA also finalized health-based, non-enforceable Maximum Contaminant Level Goals (MCLGs) for those six PFAS. Notably, the MCLGs for both PFOA and PFOS were listed as "Zero."

---

[27] Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, Proposed Rule, 87 Fed. Reg. 54,415 (Sept. 6, 2022), https://www.govinfo.gov/content/pkg/FR-2022-09-06/pdf/2022-18657.pdf.

[28] *See, e.g.*, U.S. EPA, *Human Health Toxicity Assessment for Perfluorooctanoic Acid (PFOA) and Related Salts* (Apr. 2024), https://www.epa.gov/system/files/documents/2024-05/final-human-health-toxicity-assessment-pfoa.pdf; U.S. EPA, *Human Health Toxicity Assessment for Perfluorooctane Sulfonic Acid (PFOS) and Related Salts* (Apr. 2024), https://www.epa.gov/system/files/documents/2024-05/final-human-health-toxicity-assessment-pfos.pdf; U.S. EPA, *Human Health Toxicity Assessment for Perfluorooctane Sulfonic Acid (PFOS)* (Jan. 2025), https://www.epa.gov/system/files/documents/2025-01/pfos-human-health-toxicity-assessment-infographic-factsheet.pdf; U.S. EPA, *Human Health Toxicity Assessment for Perfluorooctanoic Acid (PFOA)* (Jan. 2025), https://www.epa.gov/system/files/documents/2025-01/pfoa-human-health-toxicity-assessment-infographic-factsheet.pdf.

[29] U.S. EPA, *Per- and Polyfluoroalkyl Substances (PFAS): Final PFAS National Primary Drinking Water Regulation*, https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (last visited Apr. 15, 2026).

141.     The World Health Organization, International Agency for Research on Cancer ("IARC") has classified PFOA as "carcinogenic to humans" based on strong evidence that it has some of the key properties of a carcinogen in people who are exposed to it and sufficient evidence it can cause cancer in laboratory animals.[30]

142.     In 2022, the California Office of Environmental Health Hazard Assessment listed PFOA as a chemical known to the state of California to cause cancer.[31]

143.     In 2023, the Yale School of Public Health conducted a PFAS study, in which two PFAS chemicals "spurred cancer cells in the lab to migrate to new positions," which was "an indication that the chemicals could contribute to cancer metastasis in living organisms."[32] The Yale article further explained that PFAS "chemicals show up in the blood of newborns, of people living in sub-Arctic Indigenous communities, in fish and mussels, even birds' eggs."[33] "No level of PFAS in the body is considered safe, and they have been linked to a litany of health problems, including cancers."[34]

---

[30] *See* World Health Org., Int'l Agency for Research on Cancer, *IARC Monographs on the Identification of Carcinogenic Hazards to Humans: Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS), Vol. 135* (updated Mar. 2025), https://publications.iarc.who.int/636; World Health Org., Int'l Agency for Research on Cancer, *IARC Monographs Evaluate the Carcinogenicity of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS)* (Dec. 1, 2023), https://www.iarc.who.int/news-events/iarc-monographs-evaluate-the-carcinogenicity-of-perfluorooctanoic-acid-pfoa-and-perfluorooctanesulfonic-acid-pfos/.

[31] State of Cal., Cal. Envtl. Prot. Agency, *Notice to Interested Parties: Chemical Listed Effective February 25, 2022 as Known to the State of California to Cause Cancer: Perfluorooctanoic Acid,* https://oehha.ca.gov/sites/default/files/media/downloads/crnr/listingnoticepfoa022522.pdf (Feb. 25, 2022) (last visited Apr. 15, 2026).

[32] Jenny Blair, Yale Sch. of Med., *Yale Study: "Forever Chemicals" Promote Cancer Cell Migration: New Research Evaluates the Relationship Between PFAS and Colorectal Carcinoma* (Dec. 11, 2023), https://medicine.yale.edu/news-article/yale-study-forever-chemicals-promote-cancer-cell-migration/.

[33] *Id.*

[34] *Id. See also*, David Andrews, Ph.D., Envtl. Working Grp., *FDA Studies: "Short-Chain" PFAS Chemicals More Toxic Than Previously Thought* (Mar. 9, 2020), https://www.ewg.org/news-insights/news/fda-studies-short-chain-pfas-chemicals-more-toxic-previously-thought (FDA studies regarding 6:2 FTOH,

144.    Thus, the scientific community, researchers, environmentalists, state and federal government agencies, and the World Health Organization, have all raised significant concerns about PFAS due to their persistence, prevalence, toxicity, and ability to be absorbed and bioaccumulate in the human body.

145.    PFAS have been formally recognized as hazardous to the environment and human and animal health and safety by multiple U.S. and international organizations, including the EPA, Agency for Toxic Substances and Disease Registry, National Institute of Environmental Health Sciences, Environmental Counsil of the States, the European Environmental Agency, Stockholm Convention on Persistent Organic Pollutants (to which the United States is a signatory), and the National Institute of Standards and Technology ("NIST").

**B.    Defendants' Use of PFAS in Turnout Gear**

146.    For decades, Defendants have designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, and/or sold Turnout Gear and Turnout Gear components that are intentionally laden with PFAS.

147.    Defendants expected their PFAS Turnout Gear and PFAS-containing components to reach fire departments and firefighters without substantial change in the condition in which they were designed and manufactured, and they did so reach Earlville, Class Members, and their firefighters.

148.    Turnout Gear is a multi-component system that is certified for use in structural firefighting pursuant to certain performance standards issued by the NFPA, a nonprofit consensus-standards body whose codes define the minimum design, performance, testing, and

---

indicating that "human health risks of this important short-chain PFAS have been significantly underestimated")(last visited Apr. 23, 2026).

labeling requirements for protective ensembles used in the fire service. Defendants and other manufacturers must meet NFPA requirements through accredited third-party testing before their Turnout Gear can be sold as NFPA compliant.

149.    Turnout Gear ensembles are generally comprised of three layers: (1) a durable, water-repellant outer shell, (2) a middle moisture barrier, and (3) an inner thermal liner, which is closest to the wearer's skin.[35]



*Source: Peaslee study.*

150.    The primary purpose of the outer shell is to protect the firefighter from direct flames. The primary purpose of the middle moisture barrier is to block the penetration of water, liquid chemicals, and heat, while also allowing perspiration and body heat to escape. Liquid resistance and vapor permeability are important for the prevention of steam burns, which can occur

---

[35] *See generally* Courtney Levin, *Know Your Gear: Understanding the Layers of Protection, FireRescue1* (Sept. 6, 2022), https://www.firerescue1.com/fire-products/turnoutgear/articles/know-your-gear-understanding-the-layers-of-protection-q10J54biuyOvTkuc/ (last visited Apr. 15, 2026).

if water and heat get trapped inside the Turnout Gear. The primary purpose of the thermal liner is to protect the firefighter from ambient heat.

151. PFAS Turnout Gear has particularly high concentrations of PFAS in the fluoropolymer moisture barriers, PFAS-based water and oil repellants, PFAS-laden aramid blends and aramid fabrics, and PFAS-containing adhesives and membranes. PFAS Turnout Gear contains substantially higher concentrations of PFAS than any other comparable industrial, occupational, or consumer apparel, gear, and PPE.

## C. NFPA Standards and Compliance Certification

152. NFPA compliance certification has become the mandatory industry baseline because state agencies, municipal procurement rules, insurers, and fire-service accreditation bodies uniformly require NFPA-compliant Turnout Gear as a condition of purchase, use, and liability coverage. Earlville and Class Members are required to purchase NFPA-compliant Turnout Gear, making certification a key priority for Defendants.

153. To be certified as compliant with NFPA standards, Turnout Gear ensembles must include a coat (3-layer composite), pants (3-layer composite), helmet, hood, gloves, footwear, a self-contained breathing apparatus, and a personal alert safety system device. The Turnout Gear must be tested and certified through an accredited third-party certifier, such as UL or SEI, pursuant to a mandatory, multi-stage process that includes UL/SEI testing on both the full garment composite (the outer shell, moisture barrier, and thermal liner tested together) and on individual components such as helmets, gloves, boots, hoods, reflective trim, closures, reinforcements, and moisture-barrier laminates.

154. NFPA does not certify Turnout Gear or component products, rather it promulgates the performance standard. UL and SEI perform the testing and certification. UL/SEI certification

is the mechanism by which NFPA compliance is proven, and fire departments, state agencies, insurers, and procurement contracts uniformly require UL/SEI-certified Turnout Gear as a condition of purchase and use.

155.    Before a Turnout Gear ensemble can even be submitted for UL/SEI certification, the components must have already been recognized, independently tested, and approved by UL or SEI for use in a UL/SEI-certified structural firefighting ensemble ("component-recognized"). The following must be component-recognized to be eligible for use in a certified Turnout Gear ensemble: moisture-barrier laminates, outer-shell fabrics, thermal-liner composites, reflective trim, closures, reinforcements, gloves, boots, helmets, and hoods.

156.    UL/SEI evaluate these components against specific NFPA performance requirements—such as liquid penetration for moisture barriers, flame resistance for shells, thermal insulation for liners, and impact or cut resistance for gloves and helmets. Only components that pass these tests become "component-recognized" and eligible for use in a certified Turnout Gear ensemble.

157.    For example, only after "component-recognition" can UL/SEI then test the three - coat and pant composite (outer shell + moisture barrier+ thermal liner) as a unified system, a certification structure designed to ensure that the final ensemble is not a collection of untested materials but a tightly controlled, interdependent system whose performance depends on the interaction of its certified parts. Defendants submit their respective components for UL/SEI testing and approval as "component-recognized" so they can supply them for use in NFPA-compliant firefighting Turnout Gear ensembles.

158.    This system prevents any one Defendant from substituting or altering individual components without triggering retesting, which in turn creates a tightly coupled supply chain in

which Defendants work collectively to determine the chemical and performance profile of the final finished Turnout Gear ensemble.

159.    The Turnout Gear Assembler Defendants assemble the NFPA-recognized components into the finished Turnout Gear ensemble, brand it under their respective brands, and submit the finished Turnout Gear ensemble for UL/SEI certification as NFPA compliant. NFPA-compliant certification attaches to the system as a whole and any hazardous substance intentionally incorporated into one component—such as PFAS-based membranes, finishes, or coatings— becomes embedded in every certified Turnout Gear ensemble.

160.    The NFPA certification process and supply-chain structure requires Defendants to share and exchange extensive documentation and disclosures, resulting in knowledge about and collaboration in design, development, manufacture, testing, packaging, labeling, disclosures and documentation, promotion and marketing, distribution, sales, and other such commercialization of Turnout Gear. As such, all the Defendants had knowledge of, agreed to, and participated in the use, scope of use, manner of use, and extent of use of PFAS in their PFAS Turnout Gear.

161.    Defendants agreed to use PFAS to meet NFPA performance requirements, despite PFAS not being required and despite the fact other safer PFAS-free alternatives could have been developed and utilized.

162.    After testing confirmed high levels of PFAS in Turnout Gear, Defendants made multiple false and misleading representations regarding the necessity of PFAS and the availability of non-PFAS technologies.

163.    In opposing new NFPA standards that incorporated regulations related to the inclusion of and disclosure of PFAS in Turnout Gear, Defendants coordinated and made false and misleading statements in both oral and written communications that were disseminated using mail

and wire. They posted on the internet, directed statements to NFPA and industry organizations, published in the media, submitted statements in legal proceedings, and otherwise widely circulated false and misleading statements using mail and wire.

164. Defendants' false and misleading representations, omissions, and other deceptive conduct delayed innovation in Turnout Gear and directly injured Earlville and Class Members by causing them to purchase PFAS Turnout Gear that contaminated their property with toxic PFAS and exposed firefighters and other employees/persons to unreasonably dangerous toxic PFAS contamination.

### D.     PFAS-Migration Science

165. PFAS-migration science shows that PFAS do not remain bound, stable, or contained within the PFAS Turnout Gear; instead, PFAS are volatile, mobile, and continuously move between layers of the PFAS Turnout Gear and further off-gas, shed, crumble, volatilize, abrade, leach, migrate and otherwise escape from the PFAS Turnout Gear during normal handling, use, storage, transportation, and laundering.

166. When exposed to heat, PFAS off-gas, break down, and degrade into highly mobile and toxic particles and dust, increasing the risk of PFAS exposure via dermal absorption, ingestion, and inhalation.[36]

167. PFAS concentrations in fluorinated polymer-treated textiles have been shown to increase with use, handling, and weathering.[37] In addition, newer, short-chain PFAS (four to six carbons) can degrade into persistent, hazardous PFAS compounds.

---

[36] A.S. Young et al., *Per- and Polyfluoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust*, J. EXPOSURE SCI. & ENVTL. EPIDEMIOLOGY 930–42 (2021).

[37] Maizel, *PFAS in New Firefighter Turnout Gear Textiles*.

168.    Once released, PFAS bind to surfaces, and readily contaminate station floors, gear rooms, apparatus bays, fabrics, drains, wastewater, dust, and soil. Because PFAS are chemically stable, water-soluble, and highly mobile, even small releases accumulate over time, creating persistent contamination that spreads through HVAC systems, wash water, runoff, and porous building materials. This migration is inherent to the chemical properties of PFAS-treated textiles and fluoropolymer membranes, meaning contamination occurs without misuse, damage, or extraordinary conditions.

169.    PFAS migrate out of PFAS Turnout Gear in multiple ways, including:

    a.    *Dermal, inhalation, and ingestion transfer to firefighters:* PFAS escape from PFAS Turnout Gear during mechanical wear, flexing, and abrasion of the outer-shell and moisture-barrier coatings. PFAS-containing particles and fibers accumulate on and within lockers, apparatus cabs, firehouse dust, and vehicles. PFAS particles transfer to skin, can be inhaled with resuspended dust, and are deposited on surfaces, furnishings, and personal property;

    b.    *Degradation of side-chain fluorinated polymers:* Fluorinated DWR chemistries on outer shells can degrade over time (due to ultraviolet ("UV") exposure, heat, laundering, and cleaning agents), releasing smaller perfluoroalkyl acids (PFAAs) that are mobile and persistent. These degradation products can migrate into wash water, off-gas at low levels, or partition into settled dust and residues on gear bags, lockers, and station surfaces;

    c.    *Laundering and decontamination:* Routine cleaning and advanced cleaning cycles remove surface PFAS from PFAS Turnout Gear and transfer them

into wash water and effluent, which can carry PFAS into sewer systems and eventually the environment. Contaminated water and sludge from washing then becomes secondary sources of environmental PFAS, potentially affecting municipal wastewater treatment plants and biosolids; and

d.  *Heat and weathering:* Repeated exposure to high temperatures, humidity, and UV radiation can change the integrity of the fluorinated coatings, leading to increased shedding of PFAS-containing fragments or conversion to more mobile PFAS species. Aging PFAS Turnout Gear becomes an even more significant source of PFAS release, even as the performance benefits of the PFAS Turnout Gear declines, due to the chemical characteristics of the PFAS molecules.

170.  PFAS Turnout Gear requires specialized destruction and disposal methods that Defendants did not warn of or disclose to Earlville and Class Members. The destruction and disposal methods are costly, and improper destruction and disposal of PFAS can compound the damages from PFAS through concentration, accumulation, increased migration, and the creation of harmful byproducts.[38]

171.  Earlville and Class Members cannot just vacuum up PFAS and dispose of contaminated property in normal trash bins. PFAS remediation requires testing, monitoring, and specialized retrieval, clean-up, destruction, and disposal procedures that must adhere to applicable state and federal regulations. Proper containment and eradication of the PFAS exposure to firefighters and other employees must also comply with OSHA obligations.

---

[38] Incomplete combustion during ailed attempts at thermal treatment create harmful air emissions.

172. The EPA's 2024 updated Interim Guidance on the Destruction and Disposal of PFAS[39] states that PFAS-containing materials require controlled disposal methods such as: engineered landfills with leachate collection, thermal destruction under specific conditions, and underground injection. The EPA emphasizes the need to prevent PFAS from entering the environment and explicitly frames PFAS as a "waste stream" requiring specialized handling.

### E.    Firefighters' Ongoing Exposure to PFAS From PFAS Turnout Gear

173. In 2024, the International Association of Fire Fighters ("IAFF") and the Metropolitan Fire Chiefs Association (Metro Chiefs) issued joint guidance based on recent studies, notifying of the contamination health risks of PFAS in PFAS Turnout Gear and making recommendations, including that: (1) Turnout Gear should not be taken into firehouse living areas; (2) when transporting Turnout Gear in personal vehicles, it should be in a sealed container or bag, and preferably not transported in the passenger compartment; (3) apparatus cabs should be cleaned regularly and after every fire; (4) individuals should wash their hands after handling PFAS Turnout Gear; (5) Legacy PFAS Turnout Gear should be replaced as new PFAS-free technologies become available; and (6) firefighters should not wear PFAS Turnout Gear on responses where this level of protection is not necessary.[40]

174. Defendants knowingly and intentionally added high concentrations of PFAS to Turnout Gear, despite knowing: 1) that PFAS exposure can have catastrophic health effects; 2) that the PFAS would migrate from the Turnout Gear and contaminate and harm surrounding property and persons; 3) that PFAS concentrations and migration would increase with normal use

---

[39] U.S. EPA, *Interim Guidance on the Destruction and Disposal of Perfluoroalkyl and Polyfluoroalkyl Substances and Materials Containing Perfluoroalkyl and Polyfluoroalkyl Substances—Version 2* (Apr. 8, 2024), 2024-interim-guidance-on-pfas-destruction-and-disposal.pdf.

[40] Int'l Ass'n of Fire Fighters, *Materials Related to Issues*, https://www.iaff.org/wp-content/uploads/2024/04/Materials-Related-to-Issues.pdf (last visited Apr. 15, 2026).

and handling of the Turnout Gear and with exposure to the extreme stressors typically encountered as part of firefighting; and 4) that there was no safe way to use PFAS as a component in Turnout Gear.

175.    At the 2022 IAFF Fallen Fire Fighter Memorial, *almost 75 percent* of the names added to the wall (348 out of 469) were members who had died from occupational cancer.[41] 72% of IAFF member line-of-duty deaths in 2023 were due to occupational cancer. In 2025, nearly 80 percent of IAFF member line-of-duty deaths were due to occupational cancer.[42]

176.    The rise in cancer rates correlates with the addition of PFAS to Turnout Gear. There are established links between PFAS and testicular cancer, mesothelioma, non-Hodgkin's lymphoma, and prostate cancer. These are four of the top eight cancers that firefighters contract more than the general public.[43]

177.    The 2020 Peaslee study,[44] which was conducted by University of Notre Dame physicists, found significant quantities of PFAS in every layer of both new (*i.e.*, still in the original packaging) and used Turnout Gear. Turnout Gear (specifically, jackets and pants) was collected from firefighters across the United States and tested. The study included Turnout Gear manufactured by Globe and Lion, as well as Turnout Gear manufactured with specialty fabrics from Gore, over several production years.

---

[41] Int'l Ass'n of Fire Fighters, Fire Fighter Cancer Awareness Month, *available at* https://www.iaff.org/cancer-awareness-month/.

[42] *Id.*

[43] *Id.*

[44] Graham F. Peaslee et al., *Another Pathway for Firefighter Exposure to Per- and Polyfluoroalkyl Substances: Firefighter Textiles*, ENVTL. SCI. & TECHNOL. LETT. 7(8), 594–99 (2020), https://doi.org/10.1021/acs.estlett.0c00410.

178.    In "every textile sample tested," the researchers found "very high" total fluorine levels—a reliable indicator of total PFAS concentration—in both the moisture barrier and outside shell layers.[45] In the middle moisture barriers, total fluorine levels were typically greater than 30%, a result too high to be quantified by particle-induced gamma-ray emission and consistent with use of PTFE in the middle moisture barriers.

179.    The Turnout Gear also contained significant levels of PFAS Chemicals, including PFOA, PFOS, PFBA, PFPeA, PFHxA, PFHpA, PFNA, PFDA, PFUnA, PFDoA, PFBS, 6:2 FTS, and 8:2 FTS. In all three layers of tested Turnout Gear, PFOA was present at alarmingly high levels.

180.    For instance, in one set of gear that was tested, the outer shell contained 182 parts per billion and the thermal liner contained 78 parts per billion. To put these numbers into perspective, the EPA has set the MCL for PFOA in drinking water at 4 parts per trillion. The amount of PFOA present in the Turnout Gear that was tested was 182,000 parts per trillion in the outer shell and 78,000 parts per trillion in the thermal liner. In the thermal liners, "significant fluorine signatures" were found, indicating that "PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin."[46]

181.    The Peaslee study noted further: "Startlingly, a garment-to-hand transfer of total fluorine . . . was also observed when researchers simply manipulated the textiles in our laboratory," which strongly supports the premise that side-chain fluoropolymers and the PFAS they bind release to the environment upon wear.[47]

---

[45] *Id.*

[46] *Id.*

[47] *Id.*

182.    Lead researcher Graham Peaslee commented that firefighter Turnout Gear contains "'the most highly fluorinated textiles [he had] ever seen'"[48] and that the levels of PFAS in the Turnout Gear means that the firefighters are "swimming in a sea of [PFAS]. . .Those numbers for scientists are scarily high."[49]

183.    Other peer-reviewed scientific research has confirmed that elevated blood levels of PFAS have been found in firefighters with dermal absorption through direct contact between the firefighters' skin and PFAS Turnout Gear being "a key exposure route."[50] Extensive scientific research and studies have demonstrated that firefighter exposure through dermal absorption, inhalation, and ingestion from the intended and expected use, cleaning, and storage of the gear presents a substantial risk of injury to the health and safety of the firefighters so exposed, including the risk of contracting cancer and other serious diseases.[51]

184.    Multiple biomonitoring studies show that firefighters often have substantially higher levels of certain PFAS in serum than the general population.[52]

---

[48] Raleigh McElvery, *Protective Gear Could Expose Firefighters to PFAS*, CHEM. & ENG'G NEWS (July 1, 2020), https://cen.acs.org/environment/persistent-pollutants/Protective-gear-expose-firefighters-PFAS/98/i26.

[49] Andrew Wallender, *Firefighters Face New Possible Risk From Toxic PFAS: Their Gear*, Bloomberg Law (June 23, 2020), https://news.bloomberglaw.com/pfas-project/firefighters-face-new-possible-risk-from-toxic-pfas-their-gear (last visited Apr. 15, 2026).

[50] G.E. Campbell et al., *PFAS-Free Moisture Barriers in Structural Firefighting Gear*, in *Toward a PFAS-Free Future: Safer Alternatives to "Forever Chemicals"* (Simona A. Bălan et al. eds., Nov. 17, 2023).

[51] Nur-Us-Shafa Mazumder et al., *Firefighters' Exposure to Per- and Polyfluoroalkyl Substances (PFAS) as an Occupational Hazard: A Review*, FRONT. MATER. (2023), https://www.frontiersin.org/journals/materials/articles/10.3389/fmats.2023.1143411/full.

[52] Grace Campbell et al., *Replacing PFAS in Firefighter Turnout Gear*, Univ. of Cal., Berkeley (2022), https://bcgc.berkeley.edu/sites/default/files/finalpresentation_firefighters_greenersolutions_12.5.2022.pdf (last visited Apr. 15, 2026).

CLASS-ACTION COMPLAINT AND DEMAND FOR JURY TRIAL                    Page **40** of **123**

185.    PFAS Turnout Gear is increasingly recognized as a potential source of PFAS exposure amongst firefighters.[53]

186.    In 2021, U.S. Congress responded to growing concerns that soaring rates of occupational cancers among firefighters may be directly caused by PFAS exposure from PFAS Turnout Gear by directing NIST to study the prevalence of PFAS in Turnout Gear.

187.    A pair of NIST studies, released in May 2023 and January 2024, found not only that Turnout Gear contains cancer-causing PFAS, but also that the Turnout Gear releases even more PFAS when subject to simulated wear and tear, in particular the physical stressors associated with firefighting activities, such as during abrasion, heat, and weathering.[54]

188.    In 2024, the states of Massachusetts and Connecticut passed laws 1) beginning in 2025, requiring notice to any person, local government, or state agency as to whether PFAS is contained in firefighter PPE being sold in either state; and 2) beginning on January 1, 2027, in Massachusetts, and in 2028 in Connecticut, banning the sale of any firefighter PPE containing PFAS.[55]

189.    In May 2024, San Francisco passed an ordinance banning PFAS in Turnout Gear and requiring replacement by June 2026.

190.    In September 2024, the NFPA introduced NFPA 1970-2025, restricting the use of PFAS in Turnout Gear and requiring special testing and certification. In December 2025, San Francisco completed the first purchase of 1,100 sets of non-PFAS Turnout Gear, which will

---

[53] Maizel, *PFAS in New Firefighter Turnout Gear Textiles*

[54] B. Hayes, Nat'l Inst. Standards & Tech., *Wear and Tear May Cause Firefighter Gear to Release More "Forever Chemicals"* (Jan. 16, 2024), https://www.nist.gov/news-events/news/2024/01/wear-and-tear-may-cause-firefighter-gear-release-more-forever-chemicals (last visited Apr. 15, 2026).

[55] Mass. Gen. Laws ch. 182 (Acts of 2024), *An Act Relative to the Reduction of Certain Toxic Chemicals in Firefighter Personal Protective Equipment*; Conn. Pub. Acts 24-59 (2024), *An Act Concerning the Use of PFAS in Certain Products*.

provide one set for every frontline suppression member. The cost of the new non-PFAS turnout gear exceeded $4.5 million dollars.[56]

191.    In announcing the purchase of the non-PFAS turnout gear, the San Francisco Fire Chief, Dean Crispen, underscored the importance of providing PFAS-free Turnout Gear: "Transitioning to PFAS-free equipment is a critical step in advancing our mission: safeguarding the public by ensuring our firefighters remain healthy and able to serve at their highest capacity . . . . By investing in the well-being of our firefighters, we strengthen the health, resilience, and safety of San Francisco as a whole."

192.    On August 15, 2025, Illinois enacted the Deputy Chief Pete Bendinelli PFAS PPE Act, named for longtime Calumet City Firefighters Local 621 member Pete Bendinelli, who died from cancer in 2025. That Act requires notices of PFAS in Turnout Gear beginning in 2026 and prohibits the manufacture, sale, and distribution of PFAS Turnout Gear beginning in 2027.

193.    In October 2025, the State of California passed AB 1181, which is directed towards the further study and replacement of PFAS Turnout Gear.  As Assemblymember Matt Haney, who sponsored AB 1181, explained, "Twenty years ago, heart disease was the leading threat to firefighter's health."  He stated further, "Today, cancer has replaced heart disease as the biggest killer of firefighters. . . . We have an obligation to ensure they are not exposed to cancer-causing chemicals from the very equipment designed to keep them safe."[57]

---

[56] City of San Francisco, *Mayor Lurie Announces San Francisco Fire Department Will Become Largest in U.S. to Adopt Safe Firefighting Gear* (Dec. 11, 2025), https://www.sf.gov/news-mayor-lurie-announces-san-francisco-fire-department-will-become-largest-in-us-to-adopt-safe-firefighting-gear.

[57] Assemblymember Matt Haney, Cal. State Assembly, Press Release, *California Bill Removing Cancerous Chemicals from Firefighter Uniforms Passes out of the Legislature and Heads to Governor Newsom's Desk* (Sept. 16, 2025), https://haney.asmdc.org/press-releases/20250916-california-bill-removing-cancerous-chemicals-firefighter-uniforms-passes.

194.    IAFF affirmed the importance of laws such as those passed in Illinois, Connecticut, Massachusetts, stating in part that: "Reducing carcinogenic exposure from protective gear is a key part of the IAFF's ongoing mission to combat the cancer epidemic in the fire service."[58]

195.    The National Fallen Firefighters Foundation, International Association of Fire Chiefs, Volunteer and Combination Officers Section, and National Volunteer Fire Council have affirmed that occupational cancer is a serious threat to firefighters.

196.    NIST, IAFF, and U.S. Fire Administration warn that PFAS in Turnout Gear are "potentially cancer-causing chemicals" linked to cancer and other serious effects.[59]

197.    Firefighters, advocacy groups, unions, government agencies, and scientific bodies are aligned in identifying PFAS Turnout Gear as a significant PFAS-exposure pathway and a catastrophic hazard to human health.

### F.    Defendants' Knowledge of PFAS Toxicity

198.    Although the general public is just beginning to discover the catastrophic impact of PFAS on the environment and human health, Defendants have known about their toxicity for decades. Moreover, Defendants shared relevant information amongst and between themselves while affirmatively misleading and actively concealing data and information about the risks of PFAS exposure and its propensity to contaminate surrounding property.

199.    Defendants' internal documents show that for decades—beginning as early as the 1950s—they have had internal research, data, studies, and toxicology reports showing unreasonably dangerous and serious adverse environmental and health impacts from PFAS, which

---

[58] *Id.*

[59] U.S. Fire Administration, *New Information on Potential Carcinogens in Firefighter Gear* (May 11, 2023), https://www.usfa.fema.gov/blog/carcinogens-in-firefighter-gear/?utm_source=copilot.com (last visited Apr. 15, 2026).

they actively hid and deliberately withheld from regulators, external researchers, and the general public, including: extensive scientific research, data, studies, and reports on chemical characteristics, toxicity, migration, and persistence, cancer-signal studies showing tumor formation, liver enlargement, liver toxicity, immune suppression, and carcinogenicity signals, and studies regarding bioaccumulation, biomagnification, environmental persistence, groundwater contamination, and occupational impacts.

200.    In a study of industry knowledge published in the Annals of Global Health, researchers extensively reviewed industry documents that established Defendants knew PFAS were "highly toxic when inhaled and moderately toxic when ingested" more than forty years before the public health community. They found further that Defendants "used several strategies that have been shown common to tobacco, pharmaceutical and other industries to influence science and regulation – most notably, suppressing unfavorable research and distorting public discourse" to conceal the dangers of PFAS.[60]

### 1.    Defendant 3M has Long Known of the Dangers of PFAS.

201.    Defendant 3M was the largest manufacturer of PFAS in the United States from the 1940s through the early 2000s.

202.    3M has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

203.    As early as the 1950s, 3M began a series of studies on the physiological and toxicological properties of PFAS, concluding that PFAS were harmful to animals, humans, and

---

[60] Philippe Grandjean et al., *The Devil They Knew: Chemical Documents Analysis of Industry Influence on PFAS Science*, ANNALS OF GLOBAL HEALTH (2023).

the environment. 3M discussed the findings of these studies internally and often shared them with

DuPont, but it did not publicize or share the findings with any regulatory agencies. Notably:

a.   In 1950, 3M documented that PFAS bioaccumulate in the blood of mice following exposure;

b.   In 1963, 3M documented PFAS as being "toxic," stable in the environment, and "completely resistant to biological attack";

c.   By the 1970s, 3M had documented PFAS in fish and was aware that PFAS were hazardous to marine life;

d.   In 1975, 3M learned there was "universal presence" of PFAS in human blood samples taken from across the United States;

e.   In 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about potential health effects;

f.   In 1978, 3M conducted multiple PFOA and PFOS studies in monkeys and rats. The studies showed that PFOA and PFOS affected the liver and gastrointestinal tract of the animals tested. 3M documented that PFAS "should be regarded as toxic";

g.   In 1978, 3M had to abort a study when all the test monkeys died within the first few days or weeks after being given food contaminated with PFOS. The deaths were attributed to the "compound effect" of PFOS;

h.      In 1979, an internal 3M report discussing the studies on PFOA and PFOS states that PFAS were "more toxic than anticipated," recommending that "lifetime rodent studies . . . be undertaken as soon as possible;"[61]

i.      In 1979, an internal 3M memo concluded it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long term chronic exposure;"[62]

j.      In 1981, 3M moved 25 female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure" based on internal research showing that PFAS were causing birth defects in rats;

k.      In 1981, 3M informed DuPont that C-8 caused birth defects in laboratory animals;[63]

l.      In 1987, 3M shared with DuPont the results of a two-year study in which rats were fed a diet with added PFAS, resulting in the growth of cancerous tumors; and

m.      In 1989, a review of mortality data amount 3M's chemical division workers found, compared to Illinois death rates, a "statistically significant excess" of deaths by "cancer of the digestive organs and peritoneum."

---

[61] Sharon Lerner, *3M Knew About Dangers of Toxic Chemicals Decades Ago, Internal Documents Show*, THE INTERCEPT (July 31, 2018), https://theintercept.com/2018/07/31/3m-pfas-minnesota-pfoa-pfos/ (last visited Apr. 15, 2026).

[62] *Id.*

[63] R.D. Ingalls, DuPont, Energy & Envtl. Affairs, Mfg. Div., Memorandum, *C-8 Perfluorooctanoate* (Apr. 6, 1981), https://www.industrydocuments.ucsf.edu/docs/kypw0228/ (last visited Apr. 15, 2026).

204.    Section 8(e) of the Toxic Substances Control Act (TSCA) required chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or to the environment."[64] This reporting requirement has been included in the TSCA since its enactment in 1976.[65]

205.    Despite decades of alarming data, 3M did not share any of its concerns about the risks of PFAS with regulatory agencies until 1998, when the company submitted a TSCA § 8(e) letter to the EPA regarding PFOS.

206.    In 1998, the EPA first learned PFAS were in the blood of the general human population. Shortly thereafter, 3M produced over 1,000 studies it had previously withheld from the EPA.

207.    In 2006, 3M agreed to pay the EPA a penalty of more than $1.5 million after being cited for violations of the TSCA, including violations for failing to disclose studies regarding PFOS, PFOA, and other PFAS.

208.    In 2022 and following a multi-year probe into both companies, the State of California announced it was suing 3M, along with DuPont, for manufacturing PFAS with knowledge of its carcinogenic properties. In response, 3M spokesperson Carolyn LaViolette released a statement that the company "acted responsibly in connection with products containing PFAS and will defend its record of environmental stewardship."[66]

---

[64] Toxic Substances Control Act § 8(e), 15 U.S.C. § 2607(e) (2018).

[65] *See* Pub. L. 94-469, Title I, § 8, Oct. 11, 1976, 90 Stat. 2027.

[66] CNN Bus., *California Sues 3M, DuPont Over Toxic "Forever Chemicals"*, CNN (Nov. 10, 2022), https://www.cnn.com/2022/11/10/business/california-3m-dupont/index.html (last visited Apr. 2026).

209.    In 2022, 3M reported to the State of Maine that it sold more than 20,000 products containing PFAS in the United States in 2021 and 2022.[67] Those products included Scotchlite reflective tape, which can be found on PFAS Turnout Gear purchased by Earlville and Class Members.

210.    Also in 2022, 3M announced it would work to discontinue the use of PFAS across its product portfolio by the end of 2025. In its announcement, Mike Roman, 3M's Chairman and Chief Executive Officer, asserted that "[w]hile PFAS can be safely made and used, we also see an opportunity to lead in a rapidly evolving external regulatory and business landscape for those we serve."[68] In connection with the announcement, and prior to the alleged phase out/discontinuation of PFAS, 3M maintained that "3M's products are safe for their intended uses."[69]

211.    Upon information and belief, as of the date of filing of this Action, 3M has not yet discontinued the use of PFAS across its product portfolio.

### 2.    DuPont has Long Known of the Dangers of PFAS.

212.    Prior to spinning off portions of the company into other entities, DuPont was the largest chemical company in the world in terms of sales.

213.    DuPont has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

214.    Internal studies were identified, ranging from 1961 to 1994, showing that DuPont had evidence of PFAS toxicity from internal animal and occupational studies which they did not

---

[67] *See* Defend Our Health, *More "Forever Chemicals" Reported in Products Sold in Maine*, https://defendourhealth.org/news/more-forever-chemicals-reported-in-products-sold-in-maine/ (last visited Feb. 6, 2026).

[68] 3M, *3M to Exit PFAS Manufacturing by the End of 2025* (Dec. 20, 2022), https://news.3m.com/2022-12-20-3M-to-Exit-PFAS-Manufacturing-by-the-End-of-2025 (last visited Apr. 15, 2026).

[69] *Id.*

publish in the scientific literature. DuPont also failed to report those findings to EPA as required under TSCA. These documents were all marked as "confidential," and in some cases, industry executives were explicit that they "wanted this memo destroyed."[70]

215.    In 1935, DuPont established Haskell Laboratories, one of the first in-house toxicology facilities, at the urging of a staff doctor worried about the company's demonstrated "tendency to believe [chemicals] are harmless until proven otherwise."[71]

216.    In 1954, DuPont employee R.A. Dickinson noted he had received an inquiry regarding PFOA's "possible toxicity."[72]

217.    As early as the 1960s, DuPont was repeatedly made aware, via both internal and external research and data, that PFAS were harmful to animals, humans, and the environment.

218.    In 1961, a team of in-house DuPont researchers concluded that PFOA was indeed toxic and should be "handled with extreme care." By 1962, a series of experiments by in-house researchers had confirmed that PFOA was associated with the enlargement of various organs in rats.[73]

219.    In 1965, 14 employees at DuPont, including the then-director of Haskell Laboratories, received a memo describing preliminary studies indicating that even low doses of a related surfactant could increase the size of rat's livers, a classic response to exposure to poison.

220.    In 1978, DuPont alerted employees to the results of a study done by 3M, which showed that 3M's employees were accumulating PFOA in their blood. Later that same year,

---

[70] Philippe Grandjean et al., *The Devil They Knew: Chemical Documents Analysis of Industry Influence on PFAS Science*, ANNALS OF GLOBAL HEALTH (2023)

[71] Sharon Lerner, *The Teflon Toxin: DuPont and the Chemistry of Deception*, THE INTERCEPT (Aug. 11, 2015), https://theintercept.com/2015/08/11/dupont-chemistry-deception/.

[72] *Id.*

[73] *Id.*

DuPont began reviewing employee medical records and measuring the levels of PFOA in the blood of its own workers, noting adverse patterns including increased rates of endocrine disorders.

221.    By 1979, DuPont was aware of studies showing that beagles exposed to PFOA had abnormal enzyme levels "indicative of cellular damage" as well as a recent 3M study showing that some rhesus monkeys died when exposed to PFOA.[74]

222.    In 1981, a confidential DuPont report identified birth defects in the children of female Teflon department employees, as well as C-8 PFAS in the children's blood.[75]

223.    In 1981, DuPont transferred women out of work assignments with potential for exposure to PFOA, alerting them to the results of a 3M study suggesting an association between PFAS exposure and birth defects.

224.    By 1982, DuPont's corporate medical director had become worried about the possibility of "current or future exposure of members of the local community from emissions leaving the plant's perimeter," as he explained in a letter to a colleague.[76]

225.    By the 1990s, DuPont knew that PFOA caused cancerous testicular, pancreatic, and liver tumors in laboratory animals.

226.    In the 1990s, DuPont began developing an alternative to PFOA. In 1993, an interoffice memo announced that "for the first time, we have a viable candidate" that appeared to be less toxic and stayed in the body for a much shorter duration of time. "Discussions were held at DuPont's corporate headquarters to discuss switching to the new compound. DuPont decided

---

[74] *Id.*

[75] DuPont, Memorandum, *C-8 Blood Sampling Results* (Apr. 1981), https://www.industrydocuments. ucsf.edu/docs/xnpw0228/ (last visited Apr. 15, 2026).

[76] *Id.*

against it [because] [p]roducts manufactured with PFOA were an important part of DuPont's business, worth $1 billion in annual profit."[77]

227.    In 1994, a small committee drafted a top-secret document, which was distributed to high-level DuPont employees around the world, discussing the need to "evaluate replacement of [PFOA] with other more environmentally safe materials" and presenting evidence of toxicity, which included a study finding an association between prostate cancer and exposure to PFOA.[78]

228.    In March 1999, 3M scientist Dr. Richard Purdy resigned from 3M due to his ecological and health concerns about PFAS.[79] In his resignation letter, Dr. Purdy expressed his "profound disappointment in 3M's handling of the environmental risks associated with the manufacture and use of perfluorinated sulfonates (PFOS) . . . and its precursors." Dr. Purdy explained, "Perfluorooctansefulfonate is the most <u>insidious</u> pollutant since PCB. It is probably more damaging than PCB because it does not degrade, whereas PCB does; it is more toxic to wildlife; and its sink in the environment appears to be biota and not soil and sediment, as is the case with PCB."

229.    In June 2000, DuPont and 3M met to "clear [the parties'] mutual understanding of the pertinent data on PFOA." Meeting notes documented that "DuPont was interested in any

---

[77] Nathaniel Rich, *The Lawyer Who Became DuPont's Worst Nightmare*, N.Y. TIMES MAG. (Jan. 6, 2016), https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-became-duponts-worst-nightmare.html.

[78] Sharon Lerner, *3M Knew About Dangers of Toxic Chemicals Decades Ago, Internal Documents Show*, THE INTERCEPT (July 31, 2018), https://theintercept.com/2018/07/31/3m-pfas-minnesota-pfoa-pfos/.

[79] *Richard Purdy, Resignation Letter to 3M* (Mar. 28, 1999), https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Wstate-SwansonL-20190910.pdf (last visited Apr. 15, 2026).

measurements of PFOA in general population samples." 3M informed DuPont that the half-life of PFOA was "much longer" than animal studies showed.[80]

230.    In 2001, a class-action lawsuit was filed against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS were manufactured.

231.    In 2003, a consultant service with experience helping companies manage issue "allegedly related to environmental exposures," beginning with Agent Orange in 1983, wrote to DuPont in anticipation of a planned meeting:

> The constant theme which permeates our recommendations on the issues faced by DuPont is that DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS. We must implement a strategy at the outset which discourages government agencies, the Earlville's bar, and misguided environmental groups from pursuing this matter any further than the current risk assessment contemplated by the Environmental Protection Agency (EPA) and the matter pending in West Virginia.…
>
> As we understand this situation, there is currently a great deal of attention focused on the safety of perfluorochemicals generally and PFOA in particular. Specifically, due to the situation in West Virginia and the activities of the Environmental Working Group, the threat of expanded litigation and additional regulation by the EPA has become acute. In response to this threat, it is necessary for DuPont to prepare an overall technical and scientific defense strategy.[81]

232.    In 2005, the EPA reached a settlement with DuPont related to violations of the TSCA for concealing the environmental and health effects of PFOA. The settlement included the largest civil administrative penalty the EPA had ever obtained under any environmental statute—

---

[80] Internal DuPont Memorandum, *DuPont Haskell Laboratory Visit* (June 30, 2000), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1721.pdf (last visited Apr. 15, 2026).

[81] Letter from P. Terrance Gaffney, Esq., The Weinberg Grp., to Jane Brooks, Vice President, Special Initiatives, DuPont de Nemours & Co., re: PFOA (Apr. 29, 2003), https://cdn.toxicdocs.org/QX/QXnogko6Eaqd8wNkE3Mj7rvRo/QXnogko6Eaqd8wNkE3Mj7rvRo.pdf.

$10.25 million—and further required DuPont to perform supplemental environmental projects worth $6.25 million.

233. In 2015, DuPont spun off its "performance chemicals" business, two-thirds of its environmental liabilities, and 90% of its active litigation to Defendant Chemours.

234. In 2019, Paul Kirsch, then-president of the fluoroproducts business at Chemours, testified before Congress that "DuPont designed the separation of Chemours to create a company where it could dump its liabilities and protect itself from environmental cleanup and related responsibilities."

235. In 2022 and following a multi-year probe into both companies, the state of California announced it was suing DuPont and 3M for manufacturing PFAS with knowledge of its carcinogenic properties. DuPont's response was to deny its role—claiming it had never manufactured PFOA, PFOS, or firefighting foam—and maintain that California's claims were without merit: "We believe this complaint is without merit, and we look forward to vigorously defending our record of safety, health and environmental stewardship."[82]

236. Despite decades of covering up the dangers caused by PFAS, DuPont still asserts to the public that "safety" is at its "core." In a 2019 article, DuPont posits that its founder E.I. Du Pont —"[u]nlike typical leaders of business and industry of the era" —"cared deeply about safety." Moreover, at DuPont, "[b]y the 1920s, safety claimed the same status as other operational priorities: such as quality, productivity, and profitability." DuPont further maintains, "Yes, a lot has changed in the more than two centuries since our founding. But our legacy of safety and health

---

[82] *California Sues 3M, DuPont Over Toxic "Forever Chemicals"* (Nov. 10, 2022), https://www.cnn.com/2022/11/10/business/california-3m-dupont/index.html (last visited Apr. 15, 2026).

lives on. And as our company transforms to meet the needs of a growing population, it will continue to be a core value at DuPont."[83]

### 3. The Remaining Defendants Also Had Knowledge of the Dangers of PFAS.

237. The remaining Defendants and other participants in the PFAS Turnout Gear supply chain also knew or should have known of the dangers of PFAS.

238. In about 2020, the City of Burlington, North Carolina enlisted Duke University scientists to investigate potential sources of PFAS that were discharging into the City's wastewater treatment plants. The City of Burlington pinpointed Elevate Textiles as "its largest source of PFAS." Thereafter, a settlement agreement required Elevate Textiles to install a closed-loop system to capture contaminated wastewater from its production lines, and it was announced that Elevate Textiles would phase out its use of PFAS in some of its products by June 15, 2025.[84]

239. Likewise, Fire-Dex recently defended against an action brought by its insurer seeking to effectively avoid its defense obligation for PFAS-related claims against the company. In its Complaint, the insurer alleged that Fire-Dex had been repeatedly named in lawsuits brought by firefighters and/or their spouses alleging bodily injuries due to PFAS exposure.

240. Gore advertises its "Materials Stewardship," that its in-house scientists "are active participants in the scientific community, lending their expertise, research and time to broaden the understanding of [PFAS]." Despite Gore's assertions about its stewardship, the State of Maryland filed suit against Gore, arising from decades of PFAS environmental contamination.

---

[83] DuPont, *At Our Core: The Historical Origins of Safety at DuPont* (May 22, 2019), https://www.dupont.com/news/safety-at-our-core.html (last visited Apr. 15, 2026).

[84] Lisa Sorg, *Burlington Will Curb PFAS Discharges, Per Legal Settlement with Haw River Assembly*, NC NEWSLINE (Aug. 2, 2023), https://ncnewsline.com/2023/08/02/burlington-will-curb-pfas-discharges-per-legal-settlement-with-haw-river-assembly/ (last visited Apr. 15, 2026).

241.    Defendant Honeywell has lobbied state officials, submitted comments, and indicated its intent to seek exemptions regarding a recently passed Minnesota law, which will take full effect in 2032, banning all non-essential uses of PFAS in 11 product categories.

242.    In 2023, Honeywell (along with manufacturing company Saint Gobain) reached a $45 million agreement with New York's Department of Environmental Conservation to implement a new water supply for the Hoosick Falls Village Water System and reimburse state taxpayers for the cost of the state's response to PFOA contamination in Hoosick Falls, New York.

243.    Facing increasing medical, environmental, governmental, and public concern regarding the dangers caused by PFAS exposure, Defendants have publicly acknowledged—whether in consumer advertising and/or product promotion, lobbying efforts, litigation, or their denials—their awareness of the substantial injuries caused by PFAS.

244.    Moreover, in the early 2020s, as the toxic exposure risk to products containing PFAS became more generally known, Defendants became aware of an ongoing world-wide movement toward eliminating PFAS from myriad consumer products, including textiles. During this period, many private companies, including Home Depot, Lowes, and Staples, began efforts to discontinue selling products containing PFAS, as did several outdoor, durable clothing companies (*e.g.*, Columbia and Marmot), clothing retailers (*e.g.*, H&M, Levi Strauss & Co.), shoe companies (*e.g.*, Adidas and New Balance), car seat manufacturers (*e.g.*, Britax and Graco), furniture companies (e.g., IKEA), personal care companies (*e.g.*, Johnson & Johnson and Oral-B), and textile manufacturing companies.

245.    In 2023, Defendant Globe's Chief Operating Officer "applaud[ed]" a New Hampshire bill titled the "PFAS Alternatives Act," and recognized "the demand for PFAS-free

materials," stating that "Globe looks forward to continuing its long-term advocacy efforts . . . to promote this investment in innovation and pass the PFAS Alternatives Act."[85]

246.   Defendants knew or should have known that PFAS Turnout Gear posed a substantial risk of injury to the health and safety of Earlville's and Class Members' firefighters, in that it placed them at increased risk of adverse, substantial, and potentially lethal health effects, including but not limited to various cancers.

247.   Defendants knew or should have known that the Turnout Gear either treated with and containing PFAS Chemicals or contained in the component parts of Turnout Gear that they manufactured, distributed, marketed, offered for sale, or sold would be used in ways in which Earlville's and Class Members' firefighters would be exposed to the toxic properties of PFAS through dermal absorption, inhalation, and ingestion.

### G.   Defendants Conspired to Cover Up and Conceal the Risks of PFAS.

248.   Although Defendants knew that Turnout Gear containing PFAS was dangerous to Earlville's and Class Members' firefighters, Defendants failed to disclose to Earlville, Class Members, or their firefighters the full extent of the health risks, and they failed to provide adequate warnings to Earlville, Class Members, and their firefighters regarding the substantial risks posed by PFAS Turnout Gear.

249.   Quite the opposite, Defendants continued to misrepresent the safety of PFAS Turnout Gear and engaged in campaigns—such as "greenwashing"—that were aimed at misinforming and lessening public and regulatory concern regarding PFAS and creating a false necessity and safety profile for PFAS.

---

[85] Globe Mfg. Co., *Globe Manufacturing Company Supports Bipartisan PFAS Alternatives Act*, PR NEWSWIRE (July 20, 2023), https://www.prnewswire.com/news-releases/globe-manufacturing-company-supports-bipartisan-pfas-alternatives-act-301882343.html (last visited Apr. 15, 2026).

250.    3M publicly advertised that "[PFAS] are safely used in many modern products for their important properties and can be safely manufactured."[86] Indeed, in a 2022 statement, 3M claimed: "While some studies have linked legacy fluorochemicals to some conditions at very high doses not typically found in everyday life, researchers from around the world have studied these materials for decades and haven't found a definitive causal link between PFOA or PFOS exposure and any health condition."[87]

251.    In 2022, 3M further publicly stated it was not necessary or appropriate to declare any PFAS hazardous.

252.    As recently as November 2025, DuPont maintained and publicly advertised that:

> In June 2019, DuPont de Nemours, Inc. (DuPont) was established as a new multi-industrial specialty products company. DuPont de Nemours has never manufactured PFOA, PFOS or firefighting foam. While DuPont is not a PFAS commodity chemical manufacturer, it does use select PFAS compounds within industrial processes pursuant to relevant environmental, health and safety rules and standards. Such uses are necessary to impart specific product performance criteria and only in products that are essential to safety and the critical functioning of society.[88]

253.    DuPont has further maintained and publicly advertised that PFAS Turnout Gear manufactured with DuPont's materials "work[s] hard to help keep your professionals safe, inside and out," "help[s] protect professionals even when the fire is out," and "are helping keep first responders safe."

---

[86] Benji Jones, *You Probably Have "Forever Chemicals" in Your Body. Here's What That Means*, Vox (June 23, 2023), https://www.vox.com/2022/8/25/23318667/pfas-forever-chemicals-safety-drinking-water (last visited Apr. 15, 2026).

[87]    3M, *Statement from 3M to Vox.com Regarding PFAS*, https://cdn.vox-cdn.com/uploads/chorus_asset/file/23968894/Statement_from_3M_to_Vox.pdf.

[88] DuPont de Nemours, Inc., *Statement on Poly- and Perfluorinated Alkyl Substances (PFAS)* (archived Nov. 16, 2025), https://web.archive.org/web/20251116202029/https://www.dupont.com/pfas.html (last visited Apr. 15, 2026).

254.    Chemours maintained and publicly advertised that "not all PFAS are the same," arguing that fluoropolymers such as PTFE are "critical to modern life" and "enable nearly every major sector of the economy."[89]

255.    The common purpose and conduct of Defendants 3M and DuPont to cover up the truth about PFAS and PFAS-laden products is shown by their conduct surrounding an MSDS that 3M sent to DuPont in 1997.

256.    The United States has long sought to protect workers who have been exposed to hazardous chemicals in the work environment. In November 1983, OSHA adopted the Hazard Communication Standard, which requires chemical manufacturers and importers to evaluate the hazards of chemicals that they produce and distribute. The Hazard Communication Standard requires information about hazards and protective measures to be disseminated on container labels and MSDSs. All employers with employees exposed to regulated chemicals must provide access to the labels and the MSDSs. Employers using the manufactured chemicals must also train employees to understand the information provided by the MSDSs and the labels and how to use the information to protect themselves. The Hazard Communication Standard covers all chemicals in American workplaces.[90]

257.    The February 1997 Material Safety Data Sheet that 3M sent to DuPont stated:

> CANCER:
> WARNING: Contains a chemical which can cause cancer. (3825-24-1)
> (1983 and 1993 studies conducted jointly by 3M and Dupont).[91]

---

[89] The Chemours Co., *Our Commitment to Responsible Chemistry*, *https://www.chemours.com/en/ sustainability/sustainability-safety/our-commitment-to-pfas-stewardship* (last visited Fefb. 6, 2026).

[90] Hazard Communication in the 21st Century Workforce: Hearing Before the Subcomm. on Emp., Safety, & Training of the S. Comm. on Health, Educ., Lab. & Pensions, 108th Cong. (Mar. 25, 2004), https://www.govinfo.gov/content/pkg/CHRG-108shrg92926/html/CHRG-108shrg92926.htm.

[91] 3M Specialty Chemicals Div., *Material Safety Data Sheet* (Feb. 7, 1997), https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Wstate-SwansonL-20190910.pdf; https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1471.pdf.

258. Instead of informing the public of the dangers caused by PFAS, 3M and DuPont suppressed the February 1997 MSDS as part of the wrongful conduct of the PFAS Concealment Scheme.

259. Indeed, a former Minnesota Attorney General testified before a United States House Committee about a lawsuit by Minnesota against 3M for PFAS pollution. In part, she testified about the 1997 MSDS that 3M gave to DuPont.[92] After quoting from the document, she testified that "*3M removed the label* that same year and *for decades sold PFAS products without warning the public* of its dangers."[93] While the former Attorney General's testimony concerned 3M, the same is true of DuPont, which associated with 3M to suppress the truth and to sell PFAS products for decades without warning the public of the dangers of those products.

260. In 2017, Lion's President wrote a letter to the editor of *The Columbus Dispatch* demanding the newspaper's retraction of a story headlined "Lawyer: Firefighters' gear may be hazardous." Schwartz asserted:

> PFOAs and PFOSs have never been components of Lion's turn-out gear, either as a coating or as a textile. All textiles we use are woven or knit with technical fibers that are engineered to be heat, flame and abrasion resistant, some of which are treated with a PTFE durable water repellant finish . . . . [B]ecause these manufacturers used PFOA in their manufacturing process as a processing aid, it is possible that trace amounts may have been present a residue when the films and finishes were incorporated into Lion's turn-out gear. However, based on all available scientific data, such nominal trace amounts . . . would not have posed any health risks to firefighters. There is absolutely no connection at all between PFOS and firefighter turnout gear. . . . We, as a part of the fire protective equipment industry, are concerned and saddened by the undeniable scientific evidence that firefighters have elevated cancer risks. . . . However, the elevated risks derives from the hazardous substances produced by the fire, not the turnout gear that protects firefighters.

---

[92] Testimony of Lori Swanson, Former Minn. Att'y Gen., Before the H. Comm. on Oversight & Reform (Sept. 10, 2019), https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Wstate-SwansonL-20190910.pdf.

[93] *Id.* (emphasis added).

261.    In 2019, Lion issued a "Customer Safety Alert" for "PFOA and Turnout Gear," asserting: "Your Lion turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job."

262.    In 2020, Paul Chrostowski, Ph.D., a consultant hired by Lion, took out a full page in the publication *Firefighter Nation*, arguing that Turnout Gear is completely safe and that any evidence to the contrary, including the Peaslee study, "create[s] unnecessary fear and misunderstanding." Chrostowski argued:

> The evidence . . . shows that firefighters are not exposed to PFAS at levels greater than control groups including the general population. So even if PFAS were found in their turnout gear, at this time there is no credible evidence that it ends up in firefighters['] bodies in amounts that would be higher than the general population.
> …
> At this point, it would be irresponsible to dissuade firefighters from using their protective gear out of fear of cancer. The materials used in turnout gear are the safest materials available, and without them, firefighters would be at extreme risk for burns and exposure to known cancer-causing toxic chemicals present on the fireground, as well as metabolic heat stress.

263.    In 2021, Lion confirmed that Chrostowski's representations reflected the company's position.

264.    Lion has publicly advertised that the company "makes the gear emergency service providers, civilian responders and militaries need to stay safe in the line of duty," emphasizing that "[w]hen it comes to firefighting, safety is a top concern."

265.    In 2019, Gore issued a public statement, asserting that "the potential exposures and associated risks of cancer effects from PFOA alternatives and non-polymeric perfluoroalkyl substances in Gore components [Turnout Gear] are insignificant."

266.    In addition, in a *New York Times* article published in 2021, Gore maintained that its Turnout Gear products were safe.[94]

267.    MSA Safety, which is Defendant Globe's parent company, maintains and publicly advertises that the company is "committed to firefighter health & safety," and that: "At MSA, your health, safety and well-being are what drive us to not only develop technologically-advanced safety equipment to help protect you on the job, but to advocate for your well-being. In fact, after more than 100 years in business, our mission remains unchanged: that men and women may work in safety and live in health."[95]

268.    Fire-Dex maintains and publicly advertises that its Turnout Gear is made with "the best materials the industry has to offer" and provides the specific benefit of "reduc[ing] . . . carcinogen exposure." Fire-Dex advertises that the company goes "beyond industry standards to ensure a proper fit for your comfort and safety," making its turnout gear products "key to keeping your crew safe!"

269.    Honeywell maintains and publicly advertises that the company's "safety solutions protect the future of 500 million workers" and that its fire fighter turnout gear is "[d]esigned to provide safety," referring to its turnout gear products as "the pioneer of safety by design."

270.    In or around 2021, Stedfast spokesperson Mike Salvato presented on the topic of PFAS, PFOS, PFOA, and PTFE in Turnout Gear, acknowledging that "PFOS and PFOA have been found to be 'potentially harmful,'" but arguing that "[i]t is important to consider the trade-off of performance with perceived health risk if eliminating PFAS in gear." Salvato acknowledged that

---

[94] *See* Hiroko Tabuchi, *Firefighters Battle an Unseen Hazard: Their Gear Could Be Toxic*, N.Y. TIMES (Jan. 26, 2021, updated Oct. 20, 2021), https://www.nytimes.com/2021/01/26/climate/pfas-firefighter-safety.html.

[95] MSA Safety, *Head to Toe Health: Firefighter Health & Safety*, https://us.msasafety.com/firefighter-health?locale=en (last visited Apr. 15, 2026)

the "Peaslee study shows that turnout gear may 'shed' some PFAS" but argued "[o]rganizations should properly put into perspective the *assumed risk with PFAS* in turnout gear with other risks fire fighters face. . . . "[W]ith the current materials available, PFAS is essential."[96]

271.   Defendants have made broad statements promoting the safety of their products, while they have worked together for decades to commercialize PFAS Turnout Gear containing dangerous levels of toxic, carcinogenic PFAS. They have repeatedly misled Earlville and Class Members by touting the safety of PFAS and their commitment to firefighters' health and safety.

272.   On multiple separate occasions, over a period of decades, Defendants withheld PFAS toxicity data during EPA inquiries, delayed or avoided disclosure during administrative reviews, submitted intentionally incomplete, false, and misleading Safety Data Sheets ("SDSs"), Premanufacturer Notices ("PMNs"), and other regulatory filings omitting known PFAS hazards. Defendants also submitted incomplete, false, omitted, and misleading PFAS toxicity, persistence, exposure pathways, and related hazard data to other federal agencies and regulators.

273.   Defendants repeated and continuous falsification, cover up, sanitization, omissions, and concealment activities related to PFAS has impeded and obstructed several other federal agencies (*i.e.*, EPA, the Agency for Toxic Substances and Disease Registry ("ATSDR"), the National Institute for Occupational Safety and Health ("NIOSH"), OSHA, and the U.S. Department of Defense ("DoD")) in the proper administration of matters within their jurisdiction and resulted in PFAS remaining largely unrestricted, unregulated, and available for use, including in PFAS Turnout Gear. Defendants have, for example, interfered with and impeded ATSDR's ability to develop toxicological profiles, NIOSH's ability to assess firefighter exposure, OSHA's

---

[96] *See* Mike Salvato, Stedfast, Inc., *PFAS, PFOA, PFOS, PTFE, and Your Turnout Gear* (presentation), https://legacy-assets.eenews.net/open_files/assets/2021/02/16/document_gw_10.pdf.

ability to identify PFAS as an occupational hazard or to set exposure limits, and DoD's ability to protect military firefighters from PFAS-laden Aqueous Film Forming Foam ("AFFF") and Turnout Gear.

### 1.   Obstruction of the EPA

274.   As set forth herein, Defendants' concealment activities were ongoing and persisted for decades. They were intended to obstruct EPA's investigation, testing, evaluation, and administration of PFAS under the TSCA, CERCLA, and the Clean Water Act, and other agencies' regulation in the proper administration of matters within their jurisdiction.

275.   The TSCA is the primary federal law that gives EPA authority to regulate industrial chemicals in U.S. commerce. It gives the EPA the power to require testing of chemicals (TSCA § 4), review new chemicals before they enter the market (TSCA § 5), require immediate reporting of substantial-risk information (TSCA § 8(e)), collect data on production, use, and exposure, and restrict or ban chemicals that pose unreasonable risks.

276.   Defendants intentionally obstructed the EPA and its administration of the TSCA by, among other things, submitting incomplete or sanitized PMNs under TSCA § 5, failing to file § 8(e) substantial-risk reports, and engaging in other actions intended to bury, conceal, cover-up, misrepresent, and omit key data, research, and information that would have triggered § 4 test rules and further investigation by the EPA. As a result, the EPA did not have a hazard profile for PFAS.

277.   EPA has ongoing jurisdiction over PFAS under the TSCA. Pursuant to TSCA § 5, the EPA reviews new chemicals before they enter commerce. Before a new chemical enters commerce, companies must submit a PMN with all known health and environmental effects, all existing test data, and any information that could inform the EPA's risk determination.

278. Defendants submitted incomplete PMNs that omitted adverse findings, failed to disclose studies showing bioaccumulation, biomagnification, persistence, and toxicity, and withheld critically important internal hazard data.

279. As a direct result, the EPA reviewed PFAS chemicals without the critical hazard,data needed to evaluate risk. This allowed PFAS to enter commerce under the false appearance of safety.

280. Under TSCA § 4, the EPA can require manufacturers to conduct or submit specific toxicity tests. If companies hide internal PFAS studies, they undermine the EPA's ability to determine whether additional testing is needed, thereby interfering with the EPA's test-rule determinations—a "matter within the jurisdiction" of the EPA.

281. Defendants know that under TSCA § 8(e) they are required to immediately report any information indicating a chemical presents a substantial risk of injury to health or the environment. Withholding adverse PFAS toxicology is concealment of records intended to impede the EPA's administration of the TSCA.

282. Many federal agencies do not conduct their own toxicology research. Rather, they depend on the completeness and truthfulness of manufacturer disclosures, TSCA § 8(e) substantial-risk reports, SDSs, TSCA § 4 testing, EPA hazard assessments, and ATSDR toxicological profiles.

283. Defendants intentionally and knowingly deprived EPA—and other federal agencies that utilize and depend on data and information from the EPA—of the scientific basis necessary to properly and thoroughly evaluate PFAS, initiate further inquiries and proceedings, learn the true chemical characteristics, toxicological profile, risks, and hazards of PFAS, and otherwise properly regulate PFAS.

284.    At all times, Defendants knew that their actions in obstructing administration of the TSCA would have a domino effect on enforcement of other statutes and federal agency action, including PFAS-related CERCLA hazardous-substance determinations and listings, OSHA exposure limits, ATSDR toxicological assessments, NIOSH firefighter-exposure studies, DoD risk evaluations, the EPA's drinking-water standards under OSHA, and other such agency action.

### 2.    Obstruction of CERCLA Hazard Determination

285.    Under CERCLA, the EPA assesses chemicals for potential listing as hazardous substances. Defendants' concealment and sanitization delayed the EPA's understanding of PFAS persistence, toxicity, and carcinogenicity, and otherwise obstructed the EPA's CERCLA hazard determination. Therefore, EPA was impeded and obstructed in evaluating PFAS for national drinking-water standards under the Safe Drinking Water Act.

### 3.    Concealment from ATSDR

286.    ATSDR, a federal public-health agency within the U.S. Department of Health and Human Services, develops toxicological profiles for hazardous substances. ATSDR considers PFAS and firefighter-exposure assessments, including through the following actions:

a.    Developing Toxicological Profiles (PFAS has a major one);

b.    Conducting exposure assessments in affected communities;

c.    Evaluating biomonitoring data (blood PFAS levels);

d.    Identifying high-risk occupational groups, including firefighters; and

e.    Providing public-health recommendations to EPA, DoD, and state agencies.

287.    ATSDR's PFAS Toxicological Profile is one of the most comprehensive federal analyses of PFAS health effects. ATSDR has jurisdiction over PFAS health assessments and relies

upon honest and truthful submissions of toxicological data from Defendants, as well as EPA data and information.

288. Defendants' concealment, omissions, sanitization, regulatory non-compliance, false and misleading statements, and other misconduct alleged herein directly impeded ATSDR's performance of its statutory duties and directly harms Earlville, Class Members and their firefighters.

### 4. Concealment from OSHA

289. OSHA is the federal agency responsible for worker health and safety, including firefighters. OSHA's ability to protect workers depends entirely on having accurate hazard information from manufacturers. Defendants' concealment, omissions, and fraudulent and misleading representations directly prevented OSHA from recognizing PFAS as an occupational hazard, which delayed protections for firefighters and other exposed workers.

290. OSHA has authority to set permissible exposure limits (PELs), issue hazard-communication requirements, require protective equipment standards, enforce employer duties under the General Duty Clause, and evaluate occupational exposure pathways.

291. Defendants' actions in submitting false and misleading documents, making false and misleading representation to government regulators, and otherwise concealing, withholding, sanitizing, and covering up key toxicity data, research, and information left OSHA blind and unable to effectively administer its duties such as: ordering firefighter-exposure studies; acknowledging PFAS as a potential occupational hazard; identifying firefighters as a high-risk group; setting PFAS exposure limits; setting PFAS-specific PPE requirements; issuing warnings about PFAS in Turnout Gear; issuing guidance on the handling and disposal of PFAS Turnout

Gear; creating workplace monitoring requirements; and implementing other firefighter-specific protections.

292.    Concealing PFAS toxicity data impeded OSHA's ability to protect workers, delayed occupational-exposure assessments, prevented hazard-communication requirements, blocked the creation of exposure limits, and otherwise obstructed the ability of federal agencies to comply with their statutory duties.

293.    After internal PFAS documents were forced into the open through litigation, the EPA finally launched PFAS risk assessments, ATSDR began toxicological evaluations, NIOSH/OSHA began occupational-exposure analyses and recognized firefighter-specific hazards, the DoD began exposure investigations, and the EPA initiated CERCLA rulemaking for PFOA/PFOS, which both received designations as hazardous substances in 2024.

### H.    Defendants Failed to Warn Earlville and Class Members of PFAS Risks

294.    During the relevant time period, Earlville and Class Members, in the ordinary course, purchased, paid for, and used PFAS Turnout Gear that Defendants designed, manufactured, assembled, certified, distributed, marketed, offered for sale, sold, and/or otherwise provided to Earlville and Class Members for use by their firefighters in performing firefighting activities.

295.    At all relevant times, Defendants expected their PFAS Turnout Gear, components, and products to reach their ultimate users, including Earlville and other Class Members, without substantial change in the condition in which they were designed and manufactured, and they did so reach those ultimate users.

296.    At all times, Defendants had a duty to design, manufacture, assemble, sell, and otherwise place into the stream of interstate commerce PFAS Turnout Gear and components that were reasonably safe and suitable for their intended use, to disclose the truth about the dangers of

PFAS and PFAS Turnout Gear, and to adequately warn Earlville, Class Members, consumers, and others. Defendants understood those duties, but nevertheless willfully failed to fulfill them.

297.   At the time of purchase of such PFAS Turnout Gear, Defendants did not adequately disclose or warn Earlville or other Class Members about: (1) the addition of, use, or extent of use of PFAS, PFAS chemicals and finishes, and PFAS-containing components in the PFAS Turnout Gear components and associated products; (2) the migration of PFAS out of the PFAS Turnout Gear and the toxic contamination of the surrounding environment, persons, and property; (3) how the intended use of the PFAS Turnout Gear and exposure to physical stressors, inherent in firefighting activities, would accelerate and intensify PFAS accumulation, concentration, migration, and contamination; (4) the known risks, nature of, and extent of the substantial harm to the health and safety of firefighters, and others exposed to the PFAS from the PFAS Turnout Gear; (5) the chemical characteristics, bioaccumulation, persistence, migration, and toxicity of PFAS, which render them unsafe and unsuitable for use in Turnout Gear; (6) instructions, methods, and protocols for destroying and disposing of PFAS Turnout Gear, as well as property contaminated by the PFAS Turnout Gear, which minimize PFAS migration, contamination, accumulation, and toxic exposures; (7) how the PFAS Turnout Gear was not merchantable, was not fit for its intended use, and was unreasonably dangerous to firefighters and others from its expected use, handling, transport, cleaning, storing, destruction and disposal; and (8) that the PFAS Turnout Gear should not be purchased, otherwise acquired by, or used by Earlville or Class Members.

298.   Defendants have repeatedly misrepresented to Earlville, Class Members, firefighters, the NFPA, government regulators, and the general public that PFAS Turnout Gear is safe for its intended uses, including the ways in which firefighters are expected to use, clean,

transport, store, and dispose of the PFAS Turnout Gear. Meanwhile, Defendants' warning labels have not adequately disclosed the products' risks.

299. Labels, product guides, and other communications and documentations associated and accompanying Defendants' PFAS Turnout Gear did not adequately disclose that the Turnout Gear contained PFAS or PFAS-containing materials, and contained no adequate warning that the handling, cleaning, using, or storing the PFAS Turnout Gear, as it was intended, would result in toxic contamination and unreasonably dangerous exposure to carcinogenic PFAS that are known to have adverse effects on human health.

300. As alleged herein, Defendants did not adequately disclose that:

   a. PFAS Turnout Gear contained PFAS;

   b. PFAS from the PFAS Turnout Gear would migrate out of and contaminate the surrounding environment, including both property and persons;

   c. Exposure of PFAS Turnout Gear to physical stressors typically encountered in firefighting (*e.g.*, heat, UV, water, etc.) significantly increases the rate and concentrations of toxic PFAS compounds migrating from the PFAS Turnout Gear;

   d. Migration of PFAS accelerates with the handling, use, exposure to environmental stressors, and age of the PFAS Turnout Gear;

   e. PFAS migrate out of the PFAS Turnout Gear even when it is not being actively used, necessitating special handling, transportation, storage, laundering, disposal, and destruction methods to minimize toxic contamination of persons and property;

   f. Newer PFAS can degrade into persistent, hazardous PFAS compounds;

g.  There are substantial adverse health risks associated with exposure to PFAS, in particular the increased health risks to firefighters due to the concentrations of PFAS, design and manufacture of PFAS Turnout Gear, physical stressors, and the chemical characteristics of PFAS, such as bioaccumulation and persistence; and

h.  Using the PFAS Turnout Gear as it was intended to be handled, worn, cleaned, used or stored, and failure to do so will increase concentration, migration, contamination and the associated unreasonably dangerous toxic exposures.

301.   Defendants also misrepresented, through public statements and concealment of information known to them, that the use of PFAS in the Turnout Gear did not make PFAS Turnout Gear unsafe or unreasonably dangerous for its intended use, handling, cleaning, and storage.

302.   In failing to disclose, warn, and otherwise acting as alleged herein, Defendants deprived Earlville and Class Members of the information necessary to make informed business decisions regarding the purchase of PFAS Turnout Gear and to take reasonable and necessary steps to protect their personnel, businesses, and property from toxic contamination caused by the ordinary and expected use, handling, cleaning, and storage of PFAS Turnout Gear.

**I.    Defendants Could Have—but Willfully Failed to—Design, Manufacture, and Sell Safer Turnout Gear**

303.   Despite Defendants' express position that PFAS were "essential" in Turnout Gear, at all relevant times, it was technologically and economically feasible to design and manufacture Turnout Gear that did not contain PFAS chemicals.

304.   At least as of 2025, PFAS-free Turnout Gear ensembles were finally made available. Such PFAS-free Turnout Gear would have been available much earlier if Defendants

had prioritized the safety of firefighters over their concealment of PFAS toxicity and monetizing PFAS products, including PFAS Turnout Gear.

305.    In fact, Defendants had the knowledge and technical ability to design and manufacture PFAS-free chemicals and materials that could be incorporated into and otherwise used as components of Turnout Gear to ensure that the Turnout Gear had appropriate durable water repellent and heat-resistive characteristics.

306.    In or around 2021, Gore announced its upcoming launch of a PFAS-free fabric waterproofing technology, which was praised for its apparent potential to "greatly increase the availability of PFAS-free water-repellant garments."[97]

307.    In or around 2021, PPE fabric manufacturer Fire-Dex, in conjunction with Milliken, and Honeywell announced the introduction PFAS-free material options for Turnout Gear.

308.    In Fall 2022, a group of students at UC Berkeley's Center for Green Chemistry, in partnership with the IAFF, conducted their own semester-long study into safer alternatives to PFAS in Turnout Gear and offered multiple, alternative recommendations for manufacturers.  For example, the students concluded that polyethylene laminate could be used as a potential alternative to PTFE in the middle moisture barrier of firefighter Turnout Gear.[98]

309.    Facing mounting public pressure, as explained by Milliken, Defendants waited until they saw the "handwriting on the wall" that PFAS in Turnout Gear faced regulation, legislative bans, and mounting lawsuits to finally design PFAS-free Turnout Gear.

---

[97] Julia John, *WL Gore to Release PFAS-Free Waterproof Material for Apparel*, Enhensa (Oct. 4, 2021), https://www.enhesa.com/resources/article/wl-gore-to-release-pfas-free-waterproof-material-for-apparel/.

[98] Grace Campbell et al., *Replacing PFAS in Firefighter Turnout Gear*, Univ. of Cal., Berkeley (2022), https://bcgc.berkeley.edu/sites/default/files/finalpresentation_firefighters_greensolutions_12.5.2022.pdf.

310.    Although Defendants denied for years that suitable PFAS-free alternatives existed or could be developed for use in Turnout Gear, Defendant Milliken proved it could develop PFAS-free alternatives in just 10 months and now admits that PFAS are not necessary components of Turnout Gear.[99]

311.    Milliken further represents that: "You can expect industry-leading levels of safety and comfort from your Milliken turnout gear, *without the use of PFAS*." and "There is a non-PFAS, non-halogenated FR product out there that gets the job done, without sacrificing comfort or performance, for members of the fire service.[100]

312.    Milliken further represents that its non-PFAS technologies not only meet certification requirements, but actually exceed "performance standards" and perform better than PFAS technologies, providing in part: "We've developed some non-PFAS technologies that repel moisture more effectively than PFAS can, and we've also created a soil-release chemistry that's better than the best existing technologies."[101]

313.    Despite the ability to develop and utilize safer PFAS-free alternatives in Turnout Gear, Defendants failed to do so for decades. As a result of Defendants' failures, there was not a single PFAS-free Turnout Gear ensemble available for purchase in the United States until 2025.

---

[99] Milliken & Co., *Milliken Successfully Eliminates PFAS from Portfolio*, https://www.milliken.com/en-us/textiles/news/milliken-successfully-eliminates-pfas-from-portfolio (last visited Apr. 15, 2026).

[100] Milliken & Co., *Why Is PFAS Used in Firefighters' Protective Gear?*, https://www.milliken.com/en-us/textiles/news/why-is-pfas-used-in-firefighters-protective-gear (last visited Apr. 15, 2026).

[101] Milliken & Co., *A Commitment Kept: How We Eliminated PFAS from Our Portfolio*, https://www.milliken.com/en-us/textiles/news/a-commitment-kept-how-we-eliminated-pfas-from-our-portfolio (last visited Apr. 15, 2026).

**J.      Defendants Benefitted from the PFAS Concealment Scheme**

314.    All Defendants benefited from their collective and coordinated conduct in furtherance of the PFAS Concealment Scheme.

315.    As a result of the PFAS Concealment Scheme, Defendants maintained their market dominance for decades and reaped billions of dollars in profit from the sale of PFAS Turnout Gear to Earlville and Class Members. Defendants' misconduct has endangered all firefighters in the United States by not only making PFAS Turnout Gear the *de facto* industry standard, but the only Turnout Gear commercially available in the United States until 2025.

316.    Defendants further benefitted from the PFAS Concealment Scheme by using their false safety narrative, omissions, non-compliance and manipulative timing of compliance with government disclosure regulations, and other false, misleading, and deceptive acts and omissions to delay and avoid government regulation and to continue selling PFAS and PFAS products, including PFAS Turnout Gear, components, and products, that otherwise would have been banned or highly regulated.

317.    Defendants benefitted by delaying, avoiding, reducing, minimizing, and otherwise avoiding their legal obligations and accountability in myriad legal actions.

318.    For example, 3M benefited, in part, because it makes dozens of PFAS-containing products and faced billions of dollars in potential liabilities. As noted in its Fiscal Year 2024 SEC Form 10-K, 3M's potential PFAS liability is substantial and "could have a material adverse effect on 3M"; it was for years a liability 3M sought to concede:

> Governmental inquiries, lawsuits, or laws and regulations involving PFAS could lead to the Company incurring liability for damages or other costs, civil or criminal proceedings, the imposition of fines and penalties, or other remedies, including orders to conduct remediation, as well as restrictions on or added costs for business operations going forward, including in the form of restrictions on

discharges at manufacturing facilities, requiring the installation of control technologies, suspension or shutdown of facility operations, switching costs in seeking alternative sources of supply, potential customer damage claims due to supply disruptions or otherwise, restoration of and/or compensation for damages to natural resources, personal injury and property damages, and reporting requirements or bans on PFAS and PFAS-containing products manufactured by the Company. The Company may also record asset retirement obligations, some of which may be material, depending in part on how the Company manages related assets in connection with these activities. Any of the foregoing could have a material adverse effect on the Company's results of operations, cash flows or consolidated financial position.

319. As noted in its parent company's Fiscal Year 2024 10-K, Globe is also facing substantial liabilities that it fought for years to concede.

### K.   Injury and Harm to Earlville and Class Members

320. Defendants have dominated the Turnout Gear market for decades by participating in and operating their PFAS Turnout Gear supply chain as a tightly knit group willing to utilize PFAS in Turnout Gear and its components, while carrying out the concealment, fraud, and omissions required to: 1) continue profiting from PFAS Turnout Gear remaining the *de facto* industry standard and avoiding innovation and competition; 2) deceive government regulators and avoid compliance and disclosures that would reveal the toxicity and dangers of PFAS, including data and information confirming their unsuitability for use in firefighting activities; and 3) insulate Defendants from liability for their decades of PFAS contamination and unreasonably dangerous exposures which have injured Earlville, Class Members, and their firefighters.

321. Defendants have unjustly increased their profitability by continuing to use PFAS in Turnout Gear, refusing innovation, and avoiding the costs of research, development, design, production, manufacture, promotion, distribution, increased competition, and other costs associated with discontinuing PFAS Turnout Gear and adopting less toxic PFAS-free alternatives.

322.   As a result of Defendants' deception, false and fraudulent statements, omissions, concealment, shadow files, cover-ups, sanitizing, and other such misconduct alleged herein, Earlville and Class Members purchased PFAS Turnout Gear believing it was safe and would protect their firefighters, but instead received Turnout Gear that was laden with toxic, persistent, migrating, cancer-causing PFAS which have contaminated their property and exposed firefighters to unreasonably dangerous risks from the highly toxic, cancer-causing PFAS.

323.   Defendants' deception and misconduct alleged herein deprived Earlville and Class Members of the information they were entitled to receive and which was necessary for them to make informed business decisions regarding purchasing the PFAS Turnout Gear acquired during the relevant time period, and to take the reasonable and appropriate steps to protect Earlville, Class Members, their firefighters, and others exposed to the dangers posed by the PFAS Turnout Gear and resulting from its intended and expected use, handling, transport, cleaning, storage, destruction, and disposal.

324.   As a result of their purchase and continued use of the defective PFAS Turnout Gear, Earlville and Class Members have suffered concrete, direct, and quantifiable injuries to their business and property, including but not limited to: (a) the purchase of PFAS Turnout Gear falsely represented as safe and compliant; (b) overpayment for PFAS Turnout Gear; (c) PFAS contamination of their fire stations, apparatuses, equipment, firetrucks, gear rooms, laundering equipment, storage facilities, bunk rooms, wastewater systems, and other property used in connection with their business activities; (d) costs of inspection, testing, monitoring, remediation, replacement, decontamination, training, policy reforms, disposal, and destruction; (e) the cost of replacement PFAS Turnout Gear; (f) increased operational and compliance expenses; and (g) other concrete injuries to their businesses and property.

325.    Earlville and Class Members are the immediate and intended victims of Defendants' fraudulent scheme, not a remote or derivative party. No more direct victim exists who could better vindicate the law.

326.    Earlville and Class member damages are ascertainable through straightforward economic calculations, including the cost of contaminated gear, replacement gear, remediation, decontamination, and property damage, without speculation or complex apportionment.

## V.    **LIMITATIONS PERIODS, FRAUDULENT CONCEALMENT, AND TOLLING**

327.    Earlville is pursuing public rights and interests in property, health, safety, and welfare through the elimination of the ongoing highly toxic PFAS environmental exposure and bioaccumulative contamination, which is unreasonably dangerous to firefighters and the general public.

328.    Earlville and Class Members are responsible for the cost of their fire department's equipment, tools, Turnout Gear, and other operational costs to safeguard life, property, and natural resources through effective fire prevention, suppression, and emergency response. Earlville and other Class Members purchase and maintain physical property such as fire stations, fire trucks, furniture, Turnout Gear, uniforms, equipment, supplies, and other such valuable property for use in firefighting activities that directly benefits and serves the public needs and interests.

329.    As this Action is brought on behalf of the public and is pursuing public rights and interests, no limitation period applies.

330.    In the alternative, Earlville alleges Defendants concealed for decades their conduct and the existence of the claims asserted herein. Defendants' active and ongoing concealment of the hazards of PFAS, and other actions as in part set forth herein, made it such that Earlville could not have reasonably discovered the causes of action alleged herein. Accordingly, the applicable

limitations for the actions and claims, at law or in equity, asserted herein, or any statute of limitations that otherwise may apply to the claims of Earlville or Class Members, should be tolled by the discovery rule with respect to claims asserted by Earlville and Class Members.

## VI.    CLASS ALLEGATIONS

331.    Earlville brings this Action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3) on behalf of itself and the following proposed Nationwide Class:

> **Proposed Nationwide Class**: All entities in the United States who purchased or paid for PFAS Turnout Gear that was designed, manufactured, assembled, certified, marketed, distributed, or sold, in whole or in part, by Defendants during the relevant time period.

Additionally, pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), Earlville brings this action on behalf of the following proposed Consumer-Statute Subclass:

> **Proposed Consumer-Statute Subclass:** All entities in the states of Alaska, Arizona, Illinois, California, Colorado, Delaware, Florida, Hawaii, Maryland, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New York,  North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Texas, Utah, Washington, and Wisconsin who purchased or paid for PFAS Turnout Gear that was designed, manufactured, assembled, certified, marketed, distributed, or sold, in whole or in part, by any of the named Defendants during the relevant time period.

332.    Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over the Action and members of their staff, as well as members of their families; (b) Defendants and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally

adjudicated on the merits or otherwise released; (e) states; (f) counsel for Earlville and Defendants; and (g) the legal representatives, successors, and assigns of any such excluded persons.

333.  Earlville reserves the right to expand, narrow, or otherwise modify or refine the Class definition based on additional information obtained through further investigation and discovery and/or to address or accommodate any concerns raised by the Court.

334.  Collectively, the Nationwide Class and Consumer-Statute Subclass are referred to as the "Class."

335.  **Ascertainability.** The proposed Class is readily ascertainable because it is defined clearly and uses objective criteria, thereby permitting Class Members to determine if they are part of the Class. Members of the Class can be identified readily through records and information in Defendants' possession, custody, or control.

336.  **Numerosity.** The Class is so numerous that joinder of individual members is impracticable. Although the exact number of members of the Class is not known to Earlville at this time, on information and belief, there are thousands of geographically dispersed Class Members.

337.  **Commonality and Predominance.** Common questions of fact and law exist for each cause of action and predominate over questions solely affecting individual members of the Class, including, but not limited to:

a.  Whether Defendants engaged in the conduct alleged herein;

b.  Whether Defendants created, developed, researched, designed, advertised, marketed, distributed, sold, or otherwise placed PFAS Turnout Gear and components into the stream of commerce in the United States;

c.   Whether Defendants knew about the dangers of PFAS and, if so, for how long;

d.   Whether Defendants' conduct resulted in the availability of PFAS Turnout Gear in the marketplace that was unreasonably dangerous for its intended and expected use, handling, transport, cleaning, storage, disposal, and destruction;

e.   Whether Defendants breached their duty to warn Earlville and the Class of the long-term health risks and consequences of exposure to the PFAS in their PFAS Turnout Gear;

f.   Whether Defendants engaged in conduct which violated 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud);

g.   Whether Defendants violated RICO;

h.   Whether an Enterprise exists within the meaning of RICO and, if so, whether Defendants were members of that Enterprise;

i.   Whether Defendants participated in or conducted the affairs of the Enterprise;

j.   Whether Defendants violated applicable state laws;

k.   Whether Earlville and Class Members suffered the same or substantially similar injury or damage;

l.   Whether Earlville and Class Members are entitled to damages and other monetary relief and, if so, in what amount; and

m.   Whether equity and law require that Defendants collectively share in the cost of the remedies, including: (1) the retrieval, removal, and proper

disposal of PFAS Turnout Gear, (2) providing Earlville and each Class Member with sufficient funds to replace its PFAS Turnout Gear with PFAS-free Turnout Gear that meets the industry standards, (3) the investigation, remediation, and/or replacement of Earlville's and Class Member's property contaminated by the PFAS Turnout Gear, and (4) other such relief to remedy the injuries and harm suffered by Earlville and the Class.

338. **Typicality:** Earlville's claims are typical of the claims of other Class Members. Earlville and other Class Members sustained damages arising out of Defendants' course of conduct as described herein. Earlville's and Class Members' injuries were directly caused by Defendants' wrongful conduct, and Earlville and Class Members assert the same claims for relief.

339. **Adequacy.** Earlville has and will continue to fairly and adequately represent and protect the interests of the Class. Earlville has retained counsel who are competent and experienced in complex litigation and class actions. Earlville has no interest that is antagonistic to those of the Class, and Defendants have no known defenses unique to Earlville. Earlville and its counsel are committed to vigorously prosecuting this Action on behalf of the Class, and they have the resources to do so. Neither Earlville nor Earlville's counsel have any interest adverse to those of the other Class Members.

340. **Substantial Benefits.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action is manageable. Earlville knows of no special difficulty to be encountered in this Action that would preclude its maintenance as a class action.

341.    **Rule 23(b)(2) Class Certification.** Defendants have acted in a manner that applies generally to the Class, making both declaratory and injunctive relief appropriate with respect to the proposed Class as a whole. Defendants' ongoing misconduct and continuing injury and harm to Earlville and the Class warrants class-wide declaratory and injunctive relief.

## VII.    LEGAL CLAIMS

### COUNT I
### Violations of Racketeer Influenced and Corrupt Organizations Act (RICO)
### 18 U.S.C. § 1962(c), (d)
### Individually and on behalf of the Class Against All Defendants

110.    Earlville incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

111.    Pursuant to 18 U.S.C. § 1961(3), all Defendants are "persons," because they do and are "capable of holding a legal or beneficial interest in property."

112.    Earlville and each member of the Class has suffered injury to their businesses and properties as a direct and proximate cause of Defendants' RICO violations and have statutory standing under 18 U.S.C. § 1964(c) to pursue civil RICO claims against Defendants and to recover treble damages, attorneys' fees, and all other relief authorized by law.

113.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Section 1962(d), in turn, makes it unlawful for "any person to conspire to violate" 18 U.S.C. §§ 1962(a)-(c).

114.    For numerous years, Defendants participated in and have been members of an association-in-fact RICO "enterprise" within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise"), whose purpose was to conceal the dangers caused by their PFAS products—

including the PFAS Turnout Gear—and to continue commercializing PFAS Turnout Gear, components, and products, despite them being unreasonably dangerous, unsafe, and unsuitable for their intended and expected uses.

115. As set forth herein, Defendants each agreed to participate in—directly or indirectly— and to conduct the affairs of the Enterprise through a pattern of racketeering activity, including violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

116. Defendants knowingly and willfully use mail and wire to commit acts of fraud, omission, misrepresentation, sanitization, concealment, obstruction, deception, indecency and to otherwise carry out their fraudulent PFAS Concealment Scheme and operate their PFAS Turnout Gear supply chain, manufacture, sale, and other such commercialization of PFAS Turnout Gear that is unreasonably dangerous, unfit, and unsuitable for use to Earlville and the Class, constituting multiple predicate acts over a period of decades in violation of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d).

117. Defendants and other Enterprise members have not undertaken the practices described herein in isolation but as part of a common fraudulent scheme and conspiracy. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the Enterprise members in these offenses and have performed acts in furtherance thereof.

### A. The RICO Enterprise

118. At all relevant times, each of the Defendants, together with their subsidiaries, affiliates, co-manufacturers, and others in their PFAS Turnout Gear supply chain were members of the Enterprise, which has existed for decades, is engaged in and whose activities affect interstate commerce, and whose hierarchy, organization, and activities occur within a well-established,

interrelated, multi-component PFAS Turnout Gear supply chain that utilizes a fraudulent PFAS Concealment Scheme to conceal the risks and dangers of PFAS while designing, manufacturing, certifying, assembling, marketing, promoting, distributing, selling, and otherwise commercializing PFAS Turnout Gear to Earlville and the Class.

119.   Defendants are Enterprise members, and with knowledge and intent have agreed to the overall objectives and common purpose of the Enterprise and have at all times participated in a coordinated course of conduct to: (1) conceal and affirmatively misrepresent the safety, suitability for use, hazards, dangers, and toxicity of PFAS, PFAS components and products, and PFAS Turnout Gear; (2) continue profiting from the manufacture, sale, and other such commercialization of PFAS, PFAS components and products, and PFAS Turnout Gear; (3) delay or prevent innovation and development of PFAS-free alternatives for use in Turnout Gear; (4) avoid and delay regulatory oversight of PFAS and compliance with state and federal government agencies; (5) minimize or avoid responsibility for injuries their PFAS Turnout Gear and other products have caused to Earlville, Class Members, their firefighters, and the environment; and (6) otherwise increase or maintain revenues and market shares and minimize losses for Enterprise members and their unnamed co-conspirators through the illegal scheme and common course of conduct alleged herein.

120.   Defendants, including 3M and the DuPont Defendants, make other products that contain PFAS. Disclosing the dangers of PFAS in Turnout Gear would have raised concerns about the safety of those products. Second, the DuPont Defendants were facing increasing potential liability for environmental harm caused by the manufacturing PFAS. Accordingly, Defendants were unwilling to disclose the dangers of PFAS in Turnout Gear so as to avoid disclosing the risks

caused by their products, including PFAS Turnout Gear. Third, if Defendants had disclosed these dangers, other firms would have competed much earlier to develop PFAS-free Turnout Gear.

121. The Enterprise members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in mail fraud and wire fraud offenses under 18 U.S.C. §§ 1341 and 1343.

122. Defendants, as members of the Enterprise, directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications about which Earlville cannot fully know at present because such information lies in Defendants' and others' hands.

123. Each Defendant plays a distinct role and has substantial control over and participation in the affairs of the Enterprise.

124. ***PFAS Chemical Finishes Defendants*** each had substantial control over, and participated in, the affairs of the Enterprise by, among other things:

    a.    Contributing an essential PFAS component—not provided by any other Enterprise member—of the finished multi-component PFAS Turnout Gear ensembles that were purchased by Earlville and the Class;

    b.    Creating, developing, researching, manufacturing, marketing, distributing, selling, and otherwise commercializing the PFAS molecules, PFAS Chemical Finishes, and other PFAS Chemicals used in finished PFAS Turnout Gear ensembles;

    c.    Communicating and coordinating with PFAS Textile Defendants and Turnout Gear Assembler Defendants about the design, sourcing, origin, characteristics, materials, ingredients, chemicals, disclosures, and

certifications of each sourced component, PFAS Chemical Finishes, and the agreed nature and extent of use of PFAS in the PFAS Turnout Gear that was sold to Earlville and the Class;

d.  3M's invention, design, manufacture, marketing, branding, certification, disclosures, distribution, and sale of 3M™ Scotchlite™ Reflective Tape and other PFAS-containing components which are used in finished PFAS Turnout Gear ensembles;

e.  Knowingly and intentionally omitting, concealing, and otherwise withholding substantial-risk information required under TSCA § 8(e), submitting incomplete or sanitized PMNs under TSCA § 5, preventing the EPA from issuing test rules under TSCA § 4, failing to comply with the Hazard Communication Standard's requirements that the chemical manufacturer, distributor, or importer provide to downstream users SDSs for each hazardous chemical to communicate information on these hazards, and making false statements, misrepresentations, and material omissions to state and federal agencies and regulators about PFAS;

f.  Decades-long misconduct in failing to make required government disclosures and concealing, misleading, misrepresenting, burying, covering up, sanitizing, and omitting data, studies, research, investigations, toxicology, toxicity, migration science, chemical characteristics, and other relevant information about PFAS to government regulators, trade organizations, third-party certifiers, Earlville, Class Members, and others;

g.    Communicating and coordinating with PFAS Textile Defendants and Turnout Gear Assembler Defendants about controlling the nature, scope, and content of information about PFAS to be made publicly available, including to Earlville and the Class in connection with their purchases of PFAS Turnout Gear;

h.    Intentionally misleading, misrepresenting, concealing, burying, covering up, sanitizing, and materially omitting data, studies, research, investigations, toxicology, toxicity, migration science, chemical characteristics, and other relevant information about PFAS safety and suitability for use in Turnout Gear

i.    Designing, producing, affixing, and otherwise disseminating inadequate and misleading warning labels, warranties, product guides, certifications, marketing materials, branding, sales materials, and other such written materials associated with the commercialization of its PFAS Chemical Finishes and other components used in PFAS Turnout Gear;

j.    Sharing and disseminating research, development, studies, reports, data, and other information related to PFAS by and between members of the Enterprise;

k.    Omitting, misrepresenting, sanitizing, concealing, misleading, defrauding, and otherwise deceiving Earlville, Class Members, government, third-party certifiers, and others about:

i.    the existence of, nature, and extent of use of PFAS and their PFAS Chemical Finishes in Turnout Gear ensembles and components;

ii.   the risks, dangers, harms, toxicity, toxicology, and chemical characteristics of PFAS, their PFAS Chemical Finishes, and other components and, in particular, the unreasonably dangerous risk of toxic exposures and other unsuitability for use in Turnout Gear due to the nature of firefighting activities and typical physical stressors;

iii.  the bioaccumulation, biomagnification, perseverance, volatility, toxicity, and migration of PFAS, PFAS Chemical Finishes, other PFAS-laden components in the PFAS Turnout Gear, and the finished PFAS Turnout Gear ensembles;

iv.   the extremely high levels of PFAS added to PFAS Turnout Gear, which are far higher than is added to any other occupational or industrial PPE;

v.    the adverse studies, data, research, and other information linking PFAS exposures, including PFAS Turnout Gear, and adverse health effects and adverse environmental impact;

vi.   the additional PFAS that are added to PFAS Turnout Gear ensembles in the finishing stage of assembly that are intentionally not disclosed and even actively concealed from regulators, certifiers, Earlville, Class Members, and the public; and

vii.  the availability and suitability of PFAS-free alternatives for Turnout Gear and their efforts to oppose regulation and disclosure of PFAS in Turnout Gear and their interference with and impeding of innovations and use of PFAS-free alternatives in Turnout Gear; and

l.  Otherwise actively participating in the Enterprise by designing, promoting, manufacturing, branding, labeling, and otherwise profiting from the commercialization of PFAS, PFAS Chemical Finishes, and other PFAS components used in PFAS Turnout Gear ensembles while knowingly and intentionally concealing the true nature and extent of toxicity, harm, migration, contamination, unreasonable toxic exposure, and injury to business and property that its finished PFAS Turnout Gear is causing Earlville, Class Members, firefighters, and others.

125.  ***PFAS Textile Defendants*** each had substantial control over (and participated in) the affairs of the Enterprise by, among other things:

a.  Manufacturing, distributing, and selling PFAS Textiles as components of PFAS Turnout Gear;

b.  Contributing an essential component—not provided by any other Enterprise member—of the finished multi-component PFAS Turnout Gear ensembles that were purchased by Earlville and Class Members;

c.  Purchasing PFAS molecules, chemicals, and Chemical Finishes from the PFAS Chemical Finishes Defendants for application and use in their fibers, fabrics, moisture barriers, and other PFAS Textiles that are used as components in finished PFAS Turnout Gear ensembles;

d.  Creating, designing, patenting, manufacturing, branding, certifying, obtaining NFPA-compliant component recognition and other certifications, marketing, promoting, distributing, selling, introducing into U.S. commerce, and otherwise commercializing PFAS Textiles, which are used

by Turnout Gear Assembler Defendants as components of the finished multi-component PFAS Turnout Gear ensembles that are sold to Earlville and Class Members;

e.   Communicating and coordinating with PFAS Chemical Finishes Defendants and Turnout Gear Assembler Defendants about the design, sourcing, origin, characteristics, materials, ingredients, chemicals, disclosures, and certifications of each sourced component used in their PFAS Textiles and about assembling the finished PFAS Turnout Gear ensembles that are sold to Earlville and Class Members, including agreeing to the use of PFAS in their PFAS Textiles and additional added PFAS;

f.   Communicating and coordinating with PFAS Chemical Finishes Defendants and Turnout Gear Assembler Defendants about controlling the nature, extent, and content of information about PFAS to be made publicly available, including to Earlville and the Class in connection with their purchases of PFAS Turnout Gear;

g.   Agreeing to mislead, misrepresent, conceal, bury, cover up, sanitize, and materially omit relevant data, studies, research, investigations, toxicology, toxicity, migration science, chemical characteristics, and other relevant information about PFAS and its suitability for use in Turnout Gear, to government regulators, trade organizations, third-party certifiers, Earlville, Class Members, and the general public;

h.   Sharing and disseminating research, development, studies, reports, data, and other information related to PFAS with members of the Enterprise;

i.     Omitting, misrepresenting, sanitizing, concealing, misleading, defrauding, and otherwise deceiving Earlville, Class Members, government, trade organizations, third-party certifiers, and others:

    i.    about the existence of, nature, and extent of use of PFAS in the PFAS Textiles used as components of finished PFAS Turnout Gear ensembles and components;

    ii.    about the risks, dangers, harms, toxicity, toxicology, and chemical characteristics of PFAS Textiles and other PFAS-laden components in PFAS Turnout Gear, and in particular their migration between layers and into the surrounding environment, causing unreasonably dangerous contamination and toxic exposures;

    iii.    about the bioaccumulation, biomagnification, perseverance, volatility, toxicity, and migration of PFAS from PFAS Textiles, other PFAS-laden components, and the finished PFAS Turnout Gear ensembles;

    iv.    about the chemical characteristics of PFAS, which render them particularly unsuited for use in firefighting and Turnout Gear due to the nature of firefighting activities and typical physical stressors;

    v.    through material omissions and deceptive, false, misleading representations in promoting, marketing, and providing product specifications for their PFAS Textiles, and endorsements of other Defendants and their PFAS-containing components and products through their websites, catalogs, product labeling, product guides,

written advertising materials, affiliated distributor materials, and other documents, guides, and advertisements;

vi.    through intentionally misleading and inadequate warnings and instructions for the handling, use, laundering, transportation, storage, disposal and destruction of their PFAS Textiles and PFAS Turnout Gear;

vii.    in making and disseminating misleading public statements about the availability and suitability of PFAS-free alternatives for Turnout Gear—including PFAS-free Textiles for Turnout Gear—opposing regulation and disclosure of PFAS in Turnout Gear, and interfering with and impeding innovations and use of PFAS-free Textiles and alternatives in Turnout Gear; and

j.    otherwise actively participating in the Enterprise by designing, promoting, manufacturing, branding, labeling and otherwise profiting from the commercialization of PFAS Textiles and other PFAS-laden components used in finished PFAS Turnout Gear ensembles while knowingly and intentionally concealing the true nature and extent of toxicity, harm, migration, contamination, unreasonable toxic exposure, and injury to business and property that PFAS Turnout Gear is causing Earlville, Class Members, firefighters, and others.

126.    ***Turnout Gear Assembler Defendants*** each had substantial control over (and participated in) the affairs of the Enterprise by, among other things:

a. Contributing an essential component—not provided by any other Enterprise member—of the finished multi-component PFAS Turnout Gear ensembles that were purchased by Earlville and Class Members;

b. Designing, marketing, assembling, obtaining NFPA-compliance and other certifications, labeling, branding, distributing, and selling the final, finished PFAS Turnout Gear ensembles (containing the other Defendants' components), which are bought and used by Earlville and Class Members;

c. Sourcing PFAS-containing outer shells, moisture barriers, thermal liners, and chemical finishes, from the other Defendants in the Turnout Gear supply chain for use in the final, finished PFAS Turnout Gear ensembles;

d. Communicating and coordinating with PFAS Chemical Finishes Defendants and PFAS Textile Defendants about the design, sourcing, origin, characteristics, materials, ingredients, chemicals, disclosures, certifications, and approvals of each sourced component used in assembling the final PFAS Turnout Gear that is sold to Earlville and Class Members, including the addition and extent of use of PFAS in each component and the finished PFAS Turnout Gear ensembles;

e. Communicating and coordinating with PFAS Chemical Finishes Defendants and PFAS Textile Defendants in controlling the nature, extent, and content of information about PFAS to be made publicly available, including to Earlville and the Class in connection with their purchase of PFAS Turnout Gear;

f.   Designing, producing, affixing, and otherwise disseminating warning labels, warranties, product guides, and branding (under their own names) of the PFAS Turnout Gear sold to Earlville and the Class;

g.   Submitting applications, documents, data, disclosures, information, undergoing testing, and undertaking other actions required to obtain certifications, such as NFPA-compliance certifications, that are required to sell the PFAS Turnout Gear to Earlville and Class Members;

h.   Omitting, misrepresenting, sanitizing, concealing, misleading, defrauding, and otherwise deceiving Earlville, Class Members, government regulators, trade organizations, third party certifiers, and others:

   i.   about the existence, nature, and extent of use of PFAS in PFAS Turnout Gear ensembles and components;

   ii.   about the risks, dangers, harms, toxicity, toxicology, and chemical characteristics of PFAS used in PFAS Turnout Gear and components and, in particular, the unreasonably dangerous risk of toxic exposures, contamination and other unsuitability of using PFAS in Turnout Gear due to the nature of firefighting activities and typical physical stressors;

   iii.   about PFAS bioaccumulation, biomagnification, perseverance, volatility and migration out of the PFAS-laden components and the finished PFAS Turnout Gear ensembles and the contamination of the surrounding environment, property, and persons;

iv.   about the chemical characteristics of PFAS, which render them particularly unsuited for use in firefighting and Turnout Gear due to the nature of firefighting activites and typical physical stressors;

v.   about the adverse studies, data, research, and other information linking PFAS exposures, including from PFAS Turnout Gear, and adverse health effects and adverse environmental impact;

vi.   about the excessive levels of PFAS utilized in finished PFAS Turnout Gear ensembles and the fact they contain more PFAS than any other occupational or industrial PPE;

vii.   about the additional PFAS added to PFAS Turnout Gear in the finishing stage of assembly that are intentionally not disclosed and even actively concealed from regulators, certifiers, Earlville, Class Members, and the public; and

viii.   in making and disseminating misleading public statements about the availability and suitability of PFAS-free alternatives for Turnout Gear, opposing regulation and disclosure of PFAS in Turnout Gear, and interfering with and impeding innovations and use of PFAS-free alternatives in Turnout Gear.

i.   Making material omissions and deceptive, false, and misleading representations in promoting, marketing, and providing product specifications and endorsements of other Defendants' components, as well as their own assembled PFAS Turnout Gear through their websites, catalogs, product labeling, product guides, written advertising materials,

affiliated distributor materials, and other documents, guides, and advertisements;

j. Providing Earlville and the Class with intentionally misleading and inadequate warnings and instructions for the handling, use, laundering, transportation, storage, disposal and destruction of PFAS Turnout Gear; and

k. Otherwise actively participating in the Enterprise by designing, promoting, assembling, branding, labeling, and otherwise profiting from the commercialization of PFAS Turnout Gear while knowingly and intentionally concealing the true nature and extent of toxicity, harm, migration, contamination, unreasonable toxic exposure, and injury to business and property that its finished PFAS Turnout Gear is causing Earlville, Class Members, firefighters, and others.

127. Defendants' participation and conduct, in furtherance of the common fraudulent purpose and scheme, constitutes a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d).

**B.     RICO Predicate Acts and Pattern of Racketeering**

128. For decades, the Enterprise members, including each Defendant, conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. §§ 1341 and 1343. As alleged herein, the racketeering acts were related, continuous, and extended over multiple decades, thereby constituting a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

129.    Defendants' and Enterprise members' use of mail and wire include, but are not limited to, the transmission, delivery, or shipment of the following communications, data, documents, and goods, all in furtherance of the common purpose and scheme:

a.    PFAS products and PFAS Turnout Gear to Earlville, Class Members, and others;

b.    Data, research, investigations, reports studies and other PFAS science and relevant safety and suitability information amongst and between themselves;

c.    Sanitized summaries of PFAS studies that omitted and underplayed the severity and extent of adverse findings;

d.    Communications directing their employees to avoid creating written records of adverse PFAS findings or to rephrase conclusions to minimize risk;

e.    Draft PFAS reports, which they exchanged and edited to remove references to cancer endpoints before external submission, and then final sanitized and manipulated reports;

f.    False and misleading representations and documents with material omissions submitted to federal agencies, including the EPA, OSHA, NIOSH, and DoD, regarding the dangers, risks, and toxicity of PFAS, PFAS migration, bioaccumulation, and biomagnification, PFAS environmental persistence, and PFAS health and safety research and data;

g.    Communications coordinating the creation and maintenance of "shadow files" or "confidential internal reports" to be maintained separately from what was provided to the EPA and others;

h.    Communications coordinating the timing of disclosures to avoid triggering regulatory review, including withholding data until compelled by litigation, and other actions designed to intentionally prevent regulators from learning the full toxicity profile of PFAS, PFAS migration science, cancer rates in firefighters, and PFAS contamination and unreasonable exposure caused by PFAS in PFAS Turnout Gear;

i.    Communications, documents, data, and information related to the hiring of scientists and experts to prepare misleading summaries related to the safety profile of PFAS and to intentionally sanitize, scrub, and minimize any adverse research, data, and information for the purpose of creating a false and misleading safety profile for PFAS and the use of PFAS in PFAS Turnout Gear;

j.    False and misleading representations and applications and supporting documents with material omissions about the safety and suitability of PFAS Turnout Gear and the nature and extent of PFAS in PFAS Turnout Gear ensembles and  components submitted to  accredited third-party certifiers such as UL and SEI in order to obtain certification as NFPA compliant and NFPA component-recognized;

k.    Communications discouraging scientists from publishing or sharing findings;

l.    Documents and communications facilitating and accompanying the orders by and sale and shipments of PFAS Turnout Gear to Earlville and Class Members;

m.   Documents and communications facilitating and accompanying the orders, specifications, sale, and shipments of components and related products throughout the Turnout Gear supply chain and otherwise by and between Enterprise members;

n.   False or misleading MSDSs, SDSs, Technical Data Sheets, and product labels;

o.   Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of PFAS Turnout Gear and components;

p.   Documents intended to facilitate the design, manufacture, marketing, certification, distribution and sale of PFAS Turnout Gear and components, including invoices, shipping records, reports, and correspondence;

q.   Documents to process and receive payment for PFAS Turnout Gear, including invoices and receipts;

r.   Payments to Enterprise members for PFAS Turnout Gear and components;

s.   Deposits of proceeds from sales of PFAS Turnout Gear by Enterprise members; and

t.   Other documents, including electronic communications.

130.   Defendants and other members of the Enterprise also use wire, electronic, and internet communications on a repeated and continuous basis—including websites, messaging, digital pathways, and other technologies—to disseminate false, fraudulent, and misleading communications and to otherwise carry out the common purpose and scheme, in violation of 18 U.S.C. § 1343, including:

a.   Marketing and promotional materials for PFAS Turnout Gear and components, which are intended to be and are directed at Earlville and Class Members;

b.   Order and inquiry forms and other automated tools to facilitate the selection of and purchase of PFAS Turnout Gear and components;

c.   Product manuals, specifications, labels, warnings, warranties, and other documents and materials related to their PFAS Turnout Gear and its components;

d.   Representations about the safety and suitability of their PFAS Turnout Gear and components for use in firefighting activities;

e.   Representations downplaying the toxicity, migration science, hazards, and harms of PFAS and PFAS Turnout Gear and its components;

f.   Publicly posted correspondence, documents, studies, data, and information submitted to third parties, regulators, and others (including press releases) which mislead, misrepresent, and omit relevant data and information about PFAS hazards, safety, and suitability for use in PFAS Turnout Gear; and

g.   Endorsing, offering for sale and otherwise commercializing not only their own PFAS-laden components and PFAS Turnout Gear, but also endorsing and promoting the PFAS Chemical Finishes, PFAS Textiles, PFAS components, and finished PFAS Turnout Gear ensembles of other Defendants and members of the Enterprise, including by placing on their own websites hyperlinks to other Defendants' websites.

131. Defendants and Enterprise members also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, distributorships, and other third-party entities in furtherance of their illegal, deceptive, and fraudulent PFAS concealment and commercialization of PFAS Turnout Gear scheme and common Enterprise purpose.

132. The mail and wire transmissions described herein were made in furtherance of the Enterprise's scheme and common course of conduct in order to deceive regulators and consumers and to lure and effectuate the purchase of products that the Enterprise members knew emit PFAS.

133. Defendants' false statements and material omissions to EPA, OSHA, NIOSH, DoD, and NFPA committees—predicate acts under 18 U.S.C. §§ 1341 and 1343—were designed to and did prevent federal agencies from further investigating or testing PFAS, issuing or requiring warnings, properly evaluating the safety of PFAS, restricting PFAS Turnout Gear, or otherwise regulating PFAS. As a direct and foreseeable result of this obstruction and fraud, PFAS Turnout Gear remained on the market for decades without hazard warnings, regulatory restrictions, or disclosure of PFAS content and was purchased and is being used by Earlville and Class Members.

134. Earlville, the Class Members, federal agencies, regulators, unions, trade organizations, accredited third-party NFPA certifiers, firefighters, and consumers, among others, relied to their detriment on Defendants' and the other Enterprise members' material misrepresentations and omissions in regulating PFAS, certifying PFAS Turnout Gear, initiating studies and testing, purchasing, using, handling, laundering, storing, transporting, destroying, and disposing of PFAS Turnout Gear, and other related matters.

135. Defendants' conspiracy allowed PFAS Turnout Gear to remain unregulated, un-warned, and falsely certified as safe and suitable for use in firefighting, causing Earlville and

Class Members to purchase and use PFAS Turnout Gear and suffer resulting contamination and economic harm.

136.    Many of the precise dates of the fraudulent uses of U.S. mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the Enterprise members' books and records.  But Earlville has described the types thereof, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include numerous communications to perpetuate and maintain the scheme, including the documents described in the preceding paragraphs.

137.    Each Defendant has committed multiple predicate acts of mail and wire fraud during the relevant time period, as set forth herein, which were related and done in furtherance the PFAS Concealment Scheme and common goals of the Enterprise, including financial gain. The predicate acts had the same or similar results, participants, victims, and methods of commission. The predicate acts were not isolated events, rather they were connected and all had the purpose of advancing the common purpose of the Enterprise and generating significant revenue and profits for the Defendants and other Enterprise members, at the expense of Earlville, the Class Members, and consumers.

138.    Defendants, and the other Enterprise members, have not undertaken the practices described herein in isolation but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), Defendants and other Enterprise members conspired to violate 18 U.S.C. § 1962(c), as described herein.  Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the Enterprise members in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses

for the Enterprise members and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

139. Enterprise members, including each Defendant, benefitted from the mail and wire fraud and other related unlawful conduct for the many reasons set forth herein.

140. Additionally, each member of the Enterprise shared the profits generated by the Enterprise, continuing to sell PFAS products for decades even though they knew the PFAS in those products posed serious dangers to human health and the environment.

141. Each Defendant and all other Enterprise members knew that the success of their conspiracy and the PFAS Concealment Scheme depended not only on their own participation, but also on the coordinated participation of the other Enterprise members.

142. Defendants' and the other Enterprise members' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Earlville's and Class Members' businesses and property, as set forth herein.

143. Earlville and Class Members are the immediate and intended victims of Defendants' fraudulent scheme, not a remote or derivative party. Their injuries are not derivative of harm to any third party; they flow directly from Defendants' racketeering conduct, satisfying the proximate-cause and direct-relationship requirements of 18 U.S.C. § 1964(c). No more direct victim exists who could better vindicate the law.

144. Defendants each knew, understood, and intended for Earlville and Class Members to purchase, pay for, and use PFAS Turnout Gear, knowing that it was unsafe and unsuited for its intended and foreseeable uses and further knowing that the PFAS in the PFAS Turnout Gear would cause injury and harm to Earlville's and Class Members' businesses and property by migrating out

of the PFAS Turnout Gear and contaminating the surrounding environment, property and persons with highly toxic, carcinogenic, and unreasonably dangerous PFAS.

145.    As a result of the conduct of the Enterprise, Earlville and Class Members have not only suffered economic injury as a result of overpaying for unsafe PFAS Turnout Gear, but also the costs associated with investigation, monitoring, repair, replacement and other remediation of property contaminated by the PFAS Turnout Gear, replacement costs for non-PFAS Turnout Gear, and losses associated with the resources being spent to remediate the damages from PFAS contamination. Moreover, Earlville and Class Members were deprived for years of the ability to buy PFAS-free Turnout Gear.

146.    Earlville brings this Action seeking for itself and each Class Member any and all relief to which they are entitled pursuant to RICO, including three times their actual damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT II
## Common Law Conspiracy
### Individually and on behalf of the Class Against All Defendants

147.    Earlville incorporates and realleges the preceding paragraphs as if fully set forth herein.

148.    Defendants, which knew that PFAS chemicals posed serious health risks, agreed and conspired to misrepresent the safety of PFAS and PFAS-products, including PFAS Turnout Gear. Defendants then suppressed negative scientific research regarding PFAS.

149.    As set forth herein, through a common law conspiracy, Defendants designed, manufactured, marketed, certified, distributed, sold, and otherwise supplied PFAS Turnout Gear, components and products to Earlville, Class Members, and the public without disclosing the

toxicity and unsuitability for use of the PFAS Turnout Gear for its intended and foreseeable use in firefighting activities.

150. Defendants conspired and carried out the PFAS Concealment Scheme alleged herein in violation of state and federal law.

151. Under the common law of each State for which claims are alleged below, Earlville alleges on information and belief that Defendants knowingly and intentionally conspired to accomplish a purpose by unlawful means as alleged in each Count under State law set forth below and committed overt acts in furtherance of that agreement.

152. As alleged herein, Defendants' misconduct directly and proximately caused injuries to Earlville's and Class Members' property and businesses. Earlville and Class Members suffered physical injuries as alleged more fully herein, including injury in the form of toxic contamination of their property.

**COUNT III**
**Strict Product Liability (Design Defect)**
**Individually and on behalf of the Class Against All Defendants**

153. Earlville incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

154. At all relevant times, Defendants were engaged in the business of manufacturing, selling, and distributing PFAS molecules, PFAS Chemical Finishes, PFAS Textiles, and PFAS Turnout Gear, components, and associated products.

155. Defendants have defectively designed their products, including in violation of the following state's laws: Alabama Extended Manufacturer's Liability Doctrine, Alaska, Arizona, Arkansas, California, Colorado, Connecticut Product Liability Act, Conn. Gen. Stat. 52-572m, *et seq.*, Delaware, Hawaii, Illinois, Indiana Products Liability Act, Ind. Code Ann. § 34-20-1-1, *et*

*seq*., Iowa, Maryland, Minnesota, Misouri, Nevada, New Hampshire, New York, New Jersey, N.J. Stat. Sec. 2A:58C-2, *et seq.*, North Carolina, Oklahoma, Or. Rev. Stat. Ann. § 30.900, *et seq*., Pennsylvania, South Carolina, South Dakota, Tennessee Products Liability Act, Tenn. Code Ann. 29-28-101, *et seq.,* Tex. Civ. Practice and Remedies Code, Ch. 82, Utah Product Liability Act, Utah Code Ann. § 78B-6-701, *et seq.,* Washington Product Liability Act, Wash. Rev. Cod Ann. § 7.72.010, *et seq.*, Wisconsin Stat. Ann. § 895.047, *et seq.*, West Virginia, and Wyoming.

156.    At all relevant times, Defendants designed, manufactured, assembled, sold, and distributed to Earlville and Class Members unreasonably dangerous PFAS Turnout Gear.

157.    Defendants' PFAS Turnout Gear is defective because the addition of toxic PFAS renders the PFAS Turnout Gear inherently and unreasonably dangerous such that its mere presence causes serious health risk to firefighters and other exposed persons.

158.    PFAS Turnout Gear is unreasonably unsafe because PFAS migrate out of the PFAS Turnout Gear even when it is not being actively used—including during transportation, laundering, storage, routine handling, and disposal—continuously contaminating the surrounding environment, property, and persons with highly toxic, carcinogenic, persistent PFAS that bioaccumulate and otherwise cause unreasonable risks of harm to human health and the environment.

159.    PFAS Turnout Gear fails to perform as safely as an ordinary user would expect, and its risks far outweigh any utility.

160.    At all relevant times, Defendants had a duty to ensure that no unreasonably dangerous product entered the stream of commerce, and they owed that duty to all persons— including the Earlville and Class Members—who might foreseeably be harmed by PFAS Turnout Gear.

161.    PFAS Turnout Gear is unreasonably dangerous for its foreseeable uses and misuses because it contains highly toxic PFAS that migrate and contaminate the surrounding environment, property, firefighters, and other exposed persons, as set forth herein.

162.    Firefighting activities involve exposure to extreme stressors that are known to result in increased concentrations of PFAS, as well as accelerated migration and contamination.

163.    Defendants designed and manufactured PFAS Turnout Gear to include high concentrations of toxic PFAS in the structural components, as well as additional PFAS added through finishing sprays, adhesives, and reinforcements. The concentration of PFAS in Turnout Gear is far higher than in any other occupational gear or PPE.

164.    Defendants knew or should have known that high exposure to extreme stressors volatize PFAS and accelerate their concentration and migration out of the PFAS Turnout Gear, causing unreasonably dangerous toxic contamination of surrounding property and persons.

165.    PFAS Turnout Gear was in a defective condition that made it unreasonably dangerous when it left Defendants' control.

166.    All Defendants contributed to and are responsible for the defective condition of the PFAS Turnout Gear, components, and associated products, and had knowledge of its existence at the time it left their control.

167.    As alleged herein, the PFAS in the PFAS Turnout Gear directly and proximately caused injuries to Earlville's and Class Members' property and businesses. Earlville and Class Members suffered physical injuries as alleged more fully herein, including injury in the form of toxic contamination of their property.

**COUNT IV**
**Strict Product Liability (Failure to Warn)**
**Individually and on behalf of the Class Against All Defendants**

168.    Earlville incorporates by reference and realleges the preceding paragraphs, as if fully set forth herein.

169.    Defendants have failed to warn, including in violation of the following state's laws: Alabama Extended Manufacturer's Liability Doctrine, Alaska, Arizona, Arkansas, California, Colorado, Connecticut Product Liability Act, Conn. Gen. Stat. 52-572m, *et seq.*, Delaware, Hawaii, Illinois, Indiana Products Liability Act, Ind. Code Ann. §§ 34-20-1-1, *et seq.*, Iowa, Maryland, Minnesota, Missouri, Nevada, New Hampshire, New York, New Jersey, N.J. Stat. Sec. 2A:58C-2, *et seq.*, North Carolina, Oklahoma, Or. Rev. Stat. Ann. § 30.900, *et seq.*, Pennsylvania, South Carolina, South Dakota, Tennessee Products Liability Act, Tenn. Code Ann. 29-28-101, *et seq.*, Tex. Civ. Practice and Remedies Code, Ch. 82, Utah Product Liability Act, Utah Code Ann. § 78B-6-701, *et seq.*, Washington Product Liability Act, Wash. Rev. Cod Ann. § 7.72.010, *et seq.*, Wisconsin Stat. Ann. § 895.047, *et seq.*, West Virginia, and Wyoming.

170.    At all relevant times, Defendants were engaged in the business of manufacturing, selling, and distributing PFAS molecules, PFAS Chemical Finishes, PFAS Textiles, and PFAS Turnout Gear, components, and associated products.

171.    At all relevant times, Defendants manufactured and sold to Earlville and Class Members the unreasonably dangerous PFAS Turnout Gear.

172.    As manufacturers, distributors, and sellers of PFAS Turnout Gear, components, and associated products, Defendants had a strict duty to adequately warn against latent dangers from reasonably foreseeable uses and misuses of their products. Defendants' duty to warn extended to

third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Earlville and the Class Members.

173. Defendants had a duty to warn about the addition of PFAS to their PFAS Turnout Gear, components, and associated products; the migration of PFAS out of PFAS Turnout Gear; PFAS contamination of the surrounding environment, property, and persons; the known risks of PFAS exposure and unreasonable dangerous hazards to human health; and other such relevant and pertinent information.

174. Defendants had a duty to disclose the truth about the toxicity, hazards, chemical characteristics, and other relevant data and information not only directly to Earlville and Class Members, but also to federal agencies and regulators, such as the EPA. Defendants failed to make the required disclosures, and affirmatively and intentionally misled the EPA and other federal agencies charged with regulating PFAS.

175. Defendants had superior knowledge of the PFAS contained in their PFAS Turnout Gear, including those contained in their PFAS Chemical Finishes, other structural components, finishing additives, and associated products. Moreover, Defendants had superior knowledge of the toxicity and risks of PFAS, as well as the risks associated with exposure to PFAS and their use by Earlville and Class Members.

176. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS and PFAS Turnout Gear, Defendants failed to warn the public, Earlville, and Class Members of those risks.

177. Any warnings Defendants may have disseminated were rendered ineffective by Defendants' widespread and long-standing efforts to advance a false PFAS safety narrative and conceal and misrepresent the public health and environmental impacts of PFAS.

178. Any warnings that Defendants may have disseminated were rendered ineffective by Defendants' conduct in furtherance of the PFAS Concealment Scheme, as set forth in part herein, including false, misleading, and deceptive statements about: (1) the existence of PFAS in their Turnout Gear, components, and associated products; (2) the extent and scope of use of PFAS in their PFAS Turnout Gear, components, and associated products; (3) the safety and suitability of PFAS in Turnout Gear, including the heightened risks and harms of PFAS use when Turnout Gear is exposed to typical physical stressors of firefighting; (4) the known chemical characteristics of PFAS, toxicity, carcinogenicity, and harm to human health, particularly due to bioaccumulation and the heightened risks linked to firefighters and firefighting activities; (5) the migration and contamination risks of PFAS in their PFAS Turnout Gear; and (6) other widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

179. Defendants' PFAS Turnout Gear, components, and associated products were unreasonably dangerous and defective because of their inadequate warnings regarding PFAS risks, and as otherwise set forth herein.

180. Defendants' PFAS Turnout Gear, components, and associated products reached Earlville, Class Members, and their other end users without substantial change in condition.

181. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Earlville and Class Members, who would have heeded legally adequate warnings about the dangers of PFAS in PFAS Turnout Gear, components, and associated products.

182. At all relevant times, Earlville and Class Members used their PFAS Turnout Gear as intended.

183.    As alleged herein, Defendants' misconduct alleged herein directly and proximately caused injuries to Earlville's and Class Members' property.

184.    Earlville and Class Members suffered physical injuries as alleged more fully herein, including injury in the form of toxic contamination of their property.

## COUNT V
### Breach of Warranties of Merchantability
### Individually and on behalf of the Class Against All Defendants

185.    Earlville incorporates and realleges the preceding paragraphs as if fully set forth herein.

186.    As all relevant times, Defendants' PFAS Turnout Gear, components, and associated products reached their end users, including Earlville and Class Members, without substantial change in the condition that Defendants intended.

187.    Defendants' PFAS Turnout Gear is accompanied by and subject to Defendants' implied warranty of merchantability.

188.    Defendants also expressly warranted to Earlville and Class Members, through written statements and advertisements, that the PFAS Turnout Gear was safe and suitable for use in firefighting activities and such other intended and foreseeable uses.

189.    The PFAS Turnout Gear was treated and/or contaminated with unreasonably unsafe PFAS, rendering the Turnout Gear not merchantable or fit for the ordinary purposes for which Turnout Gear is used.

190.    Defendants' PFAS Turnout Gear was not safe, suitable, merchantable, or otherwise fit for the ordinary purposes for which Turnout Gear is used, and it poses an ongoing substantial risk of contamination and toxic exposure to PFAS known to cause injury to the health and safety of firefighters.

191. At the time of Earlville's and Class Members' purchases, Defendants had reason to know of the general and particular requirements and needs of Earlville and Class Members regarding the PFAS Turnout Gear and that the harm resulting from Defendants' alleged conduct could not reasonably have been prevented by Earlville and Class Members.

192. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS and PFAS-laden products, as set forth herein, and their ability to design safer products, Defendants nevertheless failed to warn the public, Earlville, and Class Members of those risks and intentionally continued to design, manufacture, distribute, and otherwise commercialize PFAS Turnout Gear.

193. Under the applicable state laws, Defendants have breached the implied warranty of merchantability.

194. Under the applicable state laws, Defendants have breached their express warranties of merchantability.

195. As a consequence of the Defendants' conduct as alleged, in order for the Earlville and Class Members to remedy the harm caused by Defendants' conduct as alleged it will be necessary for Earlville and Class Members to expend the resources necessary to: (1) properly remove and dispose of the PFAS Turnout Gear; and (2) outfit each of the Earlville and Class Members' firefighters with two sets of suitable Turnout Gear that has not been treated or contaminated with PFAS compounds.

196. As a consequence of the Defendants' conduct as alleged herein, Earlville and Class Members have been wrongfully deprived of funds that were budgeted and expended to purchase suitable Turnout Gear and have added financial and legal burdens regarding the proper removal

and disposal of the PFAS Turnout Gear, PFAS contaminated property, and other injury and harm to their businesses and property.

197.    As a direct and proximate result of Defendants' misconduct alleged herein, Earlville and Class Members suffered concrete, physical injuries and harm, including injury in the form of toxic contamination of their property.

## COUNT VI
### Breach of Warranties of Fitness for Particular Purpose
### Individually and on behalf of the Class Against All Defendants

198.    Earlville incorporates and realleges the preceding paragraphs as if fully set forth herein.

199.    Defendants' PFAS Turnout Gear was treated and/or contaminated with PFAS, rendering it unfit for the particular purpose for which such Turnout Gear is used and which resulted in contamination of property and persons and a substantial risk of injury to the health and safety of firefighters and others exposed to the PFAS which migrate out of the PFAS Turnout Gear as a result of its intended and expected use, transport, cleaning, storage, handling, destruction, and disposal.

200.    At the time of the transaction at issue, Defendants had reason to know of the particular purpose for which the Turnout Gear was required and that Earlville and Class Members were relying on Defendants' skill, judgment, and particular knowledge regarding the Turnout Gear. In addition, at the time of the transactions at issue, Defendants knew of the harm to Earlville and Class Members that likely would result from Defendants' conduct as alleged herein.

201.    As a consequence of the Defendants' conduct as alleged herein, and in order for the Earlville and Class Members to remedy the harm caused by Defendants' conduct as alleged herein, it will be necessary for Earlville and the Class Members to expend the resources necessary to (1)

properly remove and dispose of the PFAS Turnout Gear; and (2) outfit each of the Earlville and Class Members' firefighters with two sets of suitable Turnout Gear that has not been treated or contaminated with PFAS compounds.

202. As a consequence of the Defendants' conduct as alleged herein, Earlville and Class Members have been wrongfully deprived of funds that were budgeted and expended to purchase suitable Turnout Gear and have added financial and legal burdens regarding the proper removal and disposal of the PFAS Turnout Gear, PFAS contaminated property, and other injury and harm to their businesses and property.

203. As a direct and proximate result of Defendants' misconduct alleged herein, Earlville and Class Members suffered concrete, physical injuries and harm, including injury in the form of toxic contamination of their property.

**COUNT VII**
**Negligence**
**Individually and on behalf of the Class Against All Defendants**

204. Earlville incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

205. Defendants, as manufacturers and suppliers of PFAS Turnout Gear, components, and associated products, owed Earlville and Class Members a duty to provide safe equipment that would not cause property damage, contamination, or unreasonable risk to human health.

206. Defendants breached their duty by designing, manufacturing, assembling, selling, and/or otherwise supplying PFAS Turnout Gear, components, and associated products containing PFAS to Earlville and Class Members.

207. Defendants breached their duty to use reasonable care in one or more of the following ways:

a.  By designing PFAS Turnout Gear to include large quantities of additional PFAS they knew would migrate out of the Turnout Gear and contaminate the surrounding environment, property, and persons with toxic, bioaccumulative, volatile, and otherwise harmful PFAS;

b.  By failing to prevent the contamination caused by PFAS and use of PFAS in their PFAS Turnout Gear, component parts, and associated products;

c.  By failing to cease the manufacture, sale, and/or distribution of PFAS Turnout Gear, components, and associated products after learning PFAS migrate out of the PFAS Turnout Gear and contaminate the surrounding environment, property, and persons, causing unreasonably dangerous exposures to toxic and carcinogenic PFAS;

d.  By failing to cease the manufacture, sale, and/or distribution of PFAS Turnout Gear, components, and associated products after learning the chemical characteristics, toxicity, carcinogenicity, and other data about the adverse health consequences associated with exposure to PFAS;

e.  By failing to reduce or minimize the scope and extent of use of PFAS in their PFAS Turnout Gear, components, and associated products and the occurrence of and acceleration of PFAS concentrations, migration, and contamination;

f.  By failing to design and manufacture safer, alternative, PFAS-free Turnout Gear, components, and associated products; and

g.  By negligently failing to warn their products' users, including Earlville and Class Members, that:

i.    the Turnout Gear contained PFAS;

ii.    PFAS would migrate out of the PFAS Turnout Gear and cause toxic exposures to humans and otherwise contaminate the surrounding property and environment with PFAS;

iii.    the chemical characteristics of PFAS made them particularly unsuited for use in Turnout Gear because exposure to heat, stress, UV, water, and other such stressors would accelerate the PFAS migration and contamination from the Turnout Gear;

iv.    PFAS Turnout Gear requires specialized handling, storage, transportation, laundering, destruction, and disposal to minimize the toxic migration, contamination, and exposures.

208.    Earlville and Class Members were known customers or end users of each Defendant's products and were therefore within the scope of the risk created by each Defendant's conduct and were the foreseeable victims of their negligent design and manufacture of the PFAS Turnout Gear, components, and associated products.

209.    During all relevant times, alternative materials have been available to produce safer, alternatives to PFAS Turnout Gear.

210.    Defendants' breach was the proximate cause of Earlville Class Members' injuries.

211.    Earlville and the Class Members have incurred costs for property damage remediation and replacement of the contaminated Turnout Gear.

212.    As alleged herein, the PFAS in the PFAS Turnout Gear directly and proximately caused injuries to Earlville and Class Members' property. Earlville and Class Members suffered

physical injuries as alleged more fully herein, including injury in the form of toxic contamination of their property.

## COUNT VIII
## Unjust Enrichment
## Individually and on behalf of the Class Against All Defendants

213.    Earlville incorporates by reference and realleges the preceding paragraphs as if fully set forth herein.

214.    As alleged herein, Defendants' wrongful conduct includes the design, manufacturing, certifying, assembling, marketi]ng, promoting, distributing, selling, and otherwise commercializing PFAS Turnout Gear, components, and associated products that are unsafe and unfit for use, unreasonably dangerous, contaminate persons and property, and are otherwise unsafe and unsuitable due to the health and environmental risks.

215.    Earlville and Class Members paid for PFAS Turnout Gear that they believed was safe, suitable for use in firefighting and in other intended and foreseeable manners, and would not cause property contamination and unreasonably dangerous exposure to harmful toxins.

216.    Earlville and Class Members instead received highly toxic, unsafe, and unreasonably dangerous PFAS Turnout Gear that caused contamination, property damage, and other injuries and harm to their businesses and property. Moreover, the injuries and harm will continue until the PFAS Turnout Gear is properly destroyed and disposed of and all PFAS contamination of the surrounding environment and property is properly remediated.

217.    As a result of their misconduct, Defendants have reaped benefits and wrongful receipt of profits.

218.    Defendants' retention of profits from the sale of PFAS Turnout Gear violates the fundamental principles of justice, equity, and good conscience.

219. The benefits Defendants received were to Earlville's and Class Members' detriment.

220. Accordingly, Defendants will be unjustly enriched unless they are ordered to disgorge those profits for the benefit of Earlville and Class Members.

221. As a result of Defendants' wrongful conduct, Earlville and Class Members are entitled to institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by Defendants, and restitution from the same.

## COUNT IX
### Violation of State Consumer Protection Laws
### Individually and on behalf of the Class Against All Defendants

222. Earlville incorporates and realleges the preceding paragraphs as if fully set forth herein.

223. Earlville and Consumer-Statute Subclass Members are consumers under each state statute.

224. Defendants have engaged in (1) unlawful, unfair, fraudulent and deceptive business acts or practices, (2) unfair methods of competition, (3) unfair, deceptive, untrue, or misleading advertising, and (4) other misconduct alleged herein, that constitute unfair competition, deception, fraud, and abusive practices in violation of the following state statutes:

  a. **Alaska:** Alaska Unfair Trade Practices and Consumer Protection Act, ALASKA STAT. ANN. § 45.50.471, *et seq.*, with respect to Class Members' purchases made in Alaska and/or purchases by Alaska residents;

  b. **Arizona**: Arizona Consumer Fraud Act ("Arizona CFA") (ARIZ. REV. STAT. § 44-1521, *et seq.)*, with respect to Class Members' purchases made in Arizona and/or purchases by Arizona residents;

c. **California**: Cal. Bus. & Prof. Cde § 17200, *et seq.* and § 17500, *et seq.*, with respect to Class Members' purchases made in California and/or purchases by California residents;

d. **Colorado:** Colorado Consumer Protection Act ("Colorado CPA"), COLO. REV. STAT. ANN. § 6-1-101, *et seq.*, with respect to Class Members' purchases made in Colorado and/or purchases by Colorado residents;

e. **Delaware**: Delaware Consumer Fraud Act, 6 Del. C. § 2513, *et seq.*, with respect to Class Members' purchases made in Delaware and/or purchases by Delaware residents;

f. **Florida**: Fla. Stat. § 501.201, *et seq.*, with respect to Class Members' purchases made in Florida and/or purchases by Florida residents;

g. **Illinois**: Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT. ANN. 505/1, *et seq.*, and Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, *et seq.*, with respect to Earlville and Class Members' purchases made in Illinois and/or purchases by Illinois residents;

h. **Hawaii**: Hawaii (HRS § 481A-1, *et seq.*), with respect to Class Members' purchases made in Hawaii and/or by Hawaii residents;

i. **Maryland**: Maryland Consumer Protection Act, MD. CODE ANN., COMM. LAW § 13-101, *et. seq.*, with respect to Class Members' purchases made in Maryland and/or purchases by Maryland residents;

j. **Michigan**: Mich. Comp. Laws §§ 445.901, *et seq.*, with respect to Class Members' purchases made in Michigan and/or by Michigan residents;

k. **Minnesota**: Minn. Stat. § 325F.68, *et seq.*, with respect to Class Members' purchases made in Minnesota and/or purchases by Minnesota residents;

l. **Missouri**: Missouri Merchandising Practices Act, MO. REV. STAT. § 407.005, *et seq.*, with respect to Class Members' purchases made in Missouri and/or purchases by Missouri residents;

m. **Montana**: Montana Consumer Protection Act, MONT. CODE ANN. § 30-14-101, *et seq.*, with respect to Class Members' purchases made in Montana and/or purchases by Montana residents;

n. **Nevada:** Nevada Deceptive Trade Practices Act, NEV. REV. STAT. § 598.0903, *et seq.*, with respect to Class Members' purchases made in Nevada and/or purchases by Nevada residents;

o. **New Hampshire**: The New Hampshire Consumer Protection Act, N.H. REV. STAT. ANN. § 358-A:2, *et seq.,* with respect to Class Members' purchases made in New Hampshire and/or purchases by New Hampshire residents;

p. **New Jersey**: New Jersey Consumer Fraud Act, N.J. STAT. ANN. § 56:8-1, *et seq.*, with respect to Class Members' purchases made in New Jersey and/or purchases by New Jersey residents;

q. **New Mexico:** New Mexico Unfair Trade Practices Act, N.M. STAT. ANN. § 57-12-1, *et seq.*, with respect to Class Members' purchases made in New Mexico and/or purchases by New Mexico residents;

r. **New York:** New York Consumer Protection Statute General Business Law § 349, et seq., with respect to Class Members' purchases made in New York and/or purchased by New York residents;

s. **North Carolina:** North Carolina Unfair and Deceptive Trade Practices Act, N.C. GEN. STAT. § 75-1.1, *et seq.*, with respect to Class Members' purchases made in North Carolina and/or purchases by North Carolina residents;

t. **Ohio:** Ohio Rev. Code Ann. §§ 1345.01, *et seq.*, with respect to Class Members' purchases made in Ohio and/or purchases by Ohio residents;

u. **Oklahoma:** Oklahoma Consumer Protection Act, OKLA. STAT. TIT. 15, § 751, *et seq.,* with respect to Class Members' purchases made in Oklahoma and/or purchases by Oklahoma residents;

v. **Oregon:** Oregon Unlawful Trade Practices Act, OR. REV. STAT. § 646.605, *et seq.*, with respect to Class Members' purchases made in Oregon and/or purchases by Oregon residents;

w. **Pennsylvania:** the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 PA. CONS. STAT. § 201-1, *et seq.*, with respect to Class Members' purchases made in Pennsylvania and/or purchases by Pennsylvania residents;

x. **South Carolina:** South Carolina Unfair Trade Practices Act, S.C. CODE ANN. § 39-5-10, *et seq.*, with respect to Class Members' purchases made in South Carolina and/or purchases by South Carolina residents;

y. **South Dakota**: South Dakota Deceptive Trade Practices and Consumer Protection Law, S.D. CODIFIED LAWS § 37-24-6, *et seq.,* with respect to Class Members' purchases made in South Dakota and/or purchases by South Dakota residents;

z. **Texas:** Texas Deceptive Trade Practices and Consumer Protection Act, TEX. BUS. & COMM. CODE § 17.4, *et seq.*, with respect to Class Members' purchases made in Texas and/or purchases by Texas residents;

aa. **Utah:** UTAH CODE ANN. § 13-11-1, *et seq.*, with respect to Class Members' purchases made in Utah and/or purchases by Utah residents.

bb. **Washington:** Washington Consumer Protection Act, WASH. REV. CODE ANN. § 19.86.010, *et seq.*, with respect to Class Members' purchases made in Washington and/or purchases by Washington residents; and

cc. **Wisconsin:** Wis. Stat. §§ 100.18, *et seq.*, with respect to Class Members' purchases made in Wisconsin and/or purchases by Wisconsin residents.

225. Earlville and the Consumer-Statute Subclass are entitled to actual damages, injunctive relief, attorneys' fees, and such other relief as the Court deems appropriate.

226. As alleged in part herein, Earlville and Class Members suffered ascertainable losses of money and property, injury-in-fact, and actual harm as a direct and proximate result of Defendants' false, misleading, unfair, deceptive, and fraudulent conduct alleged herein.

227. Additionally, Defendants engaged in gross, oppressive, or aggravated conduct, as set forth herein.

228. Earlville and Class Members seek redress for injuries resulting from the direct and natural consequences of the unlawful conduct and—to the extent applicable and recoverable under each respective state statute—actual damages, statutory damages, treble or punitive damages, pre-judgment interest, post-judgment interest, attorneys' fees, costs, and any other just and proper relief available under the corresponding state statute.

229. Defendants' misconduct presents a continuing risk to Earlville and Class Members, and Defendants' unlawful acts and practices affect the public interest.

230.    Earlville and Class Members are entitled to an order permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged herein.

## PRAYER FOR RELIEF

For these reasons, Earlville, on behalf of itself and the members of the Class, respectfully requests this Court render judgment against Defendants, jointly and severally, and grant Earlville and the Class the following equitable and monetary relief:

a.    That the Court determine that this Action may be maintained as a class action under Rule 23(a) & (b) of the Federal Rules of Civil Procedure, that the Earlville be named as Class Representative, that the undersigned be named as Lead Class Counsel of both Classes, and that the Court direct that notice of this Action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to Class Members;

b.    Certification of the proposed Nationwide and the Consumer-Statute Subclass;

c.    An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged herein;

d.    Compensatory damages for damage to business and property damage caused by the PFAS Turnout Gear, including that which occurred as a result of PFAS migration and contamination, in an amount to be determined at trial;

e.    Damages for the costs to properly investigate, clean, retrieve, remove, destroy, dispose of and/or otherwise properly remediate injuries and harm caused by the PFAS Turnout Gear and to the PFAS-contaminated property, in an amount to be determined at trial;

f.    Damages against Defendants for the cost of replacing all PFAS Turnout Gear in an amount to be determined at trial;

g.    Restitution of all amounts by which Defendants were unjustly enriched, including revenues received related to PFAS Turnout Gear, in an amount to be determined at trial;

h.    Punitive or treble damages, as allowed by law, in an amount to be determined at trial;

i.    Attorneys' fees and costs;

j.    Pre-judgment and post-judgment interest as allowed by law; and

k.   Any and all such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Earlville, on behalf of itself and Class Members, demands a trial by jury as to all issues triable as of right.

Dated:   April 27, 2026                    Respectfully submitted,

By: */s/ David M. Cialkowski*

David M. Cialkowski (MN# 0306526)
1100 IDS Center
80 S. 8th St.
Minneapolis, MN 55402
Tel: (612) 341-0400
Fax: (612) 341-0844
david.cialkowski@zimmreed.com

Kenneth A Wexler (*pro hac vice* application forthcoming)
Bethany R. Turke (*pro hac vice* application forthcoming)
Gwyneth F. Lietz (*pro hac vice* application forthcoming)
**WEXLER BOLEY & ELGERSMA LLP**
311 S. Wacker Drive, Suite 5450
Chicago, IL 60606
Telephone: (312) 346-2222
F: (312) 346-0022
kaw@wbe-llp.com
brt@wbe-llp.com
gfl@wbe-llp.com

*Counsel for Earlville and the Proposed Class*